**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Steven Roshan SKILLERN and Clifton Andre Skillern, Defendants–Appellants.**

No. 90–8556.

United States Court of Appeals, Fifth Circuit.

Nov. 18, 1991.

Walter M. Reaves, Jr., West, Tex. (Court-appointed), for defendants-appellants.

John Phinizy, LeRoy M. Jahn, Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, HIGGINBOTHAM, and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Steven and Clifton Skillern, brothers, appeal convictions for conspiracy to possess cocaine with intent to distribute. Clifton Skillern argues that there was insufficient evidence to convict him of conspiracy and that the district court erred in calculating his sentence. Clifton and Steven both argue that the district court erred by admitting a drug ledger into evidence. Finally, Steven Skillern argues that the district

court erred in overruling Steven's motion to suppress evidence recovered from the Navasota police's inventory search of an impounded car.

We find that there is insufficient evidence to support Clifton Skillern's conviction of conspiracy. We therefore do not reach Clifton's contentions regarding his sentence. We affirm in all other respects.

## I. Factual Background

A Texas grand jury indicted Clifton and Steven Skillern on October 10, 1989. The indictment, which superseded an earlier indictment, charged the Skillern brothers with conspiring to distribute and possess with intent to distribute more than 50 grams of "crack" cocaine. The grand jury named three other persons as co-conspirators.

A jury convicted the brothers. Steven Skillern was sentenced to 400 months of imprisonment, five years of supervised release, a $5,000.00 fine, and a $50.00 special assessment. Clifton Skillern was sentenced to 210 months of imprisonment, five years of supervised release, a $5,000.00 fine, and a $50.00 special assessment.

Much of the evidence at trial concerned three police stops and searches of cars. On June 8, 1988, acting on an informant's tip, the Waco police set up surveillance for a car entering Waco in route from Fort Worth. The police stopped a car containing four people that matched the furnished description. Two of the people in the car, Lawrence Johnson and James Jones, were later indicted as co-conspirators of the Skillern brothers. Two other persons in the car were later named as co-conspirators. Neither Skillern brother was in the car. A search produced two clear bags of cocaine from the purse of an unindicted co-conspirator, Keesha Ridge.

The second car stop and search occurred on December 2, 1989, when a Navasota police officer, Officer McNew, accompanied by another officer, stopped a car for speeding. Lawrence Johnson was driving the car, with four passengers, including Steven Skillern who was seated in the front seat. Officer McNew testified at trial that he saw Steven Skillern shoving something under the front seat of the car when the car was stopped. Because Johnson lacked a driver's license and proof of insurance, McNew arrested Johnson and impounded the car, calling a wrecker to tow the car into the police station. There is no dispute that the Navasota police department's standard procedure is to impound the car and then make an inventory of the car's contents, where a driver is arrested on a state highway for driving without a license, unless the owner of the car consents to the release of the car to another person.

McNew drove Johnson and the other passengers to the police station. McNew testified that he drove the other occupants of the car besides Johnson to the police station because it was standard department procedure not to leave passengers on a highway shoulder after the driver is arrested for driving without a license. McNew testified that he would have allowed Johnson to designate one of the licensed occupants to take custody of the car and drive the other occupants to their destination. However, McNew never told Johnson that he could make such a request, and Johnson did not request that his car be given to a co-passenger.

The police conducted an inventory search of the car at the police station in Navasota. In the back seat of the car, on the floor, the police found a satchel containing papers and under the satchel, a bag filled with cocaine base. Under the front seat on the passenger's side, the police found a second bag, also filled with cocaine base. The two bags together contained 1,117.29 grams of cocaine base. The police then arrested all four of the car's occupants for possession of a controlled substance. The police later found a shotgun in the trunk of the car.

The third car stop and search occurred on April 22, 1989, when a Texas state trooper stopped Johnson for speeding in Falls County, Texas. Again, Johnson had no driver's license. He gave the officer a false name. Johnson was again arrested; a search of Johnson produced $2,000.00 and a telephone pager, which Johnson claimed belonged to Steven Skillern. The car offi-

cer found $8,000.00 and a drug ledger in the car. The $2,000 seized in the search of Johnson contained traces of cocaine.

Two days later, after a period of surveillance, the Waco police searched a Waco apartment leased by Steven Skillern's girlfriend. The police seized a drug ledger, a stolen pistol, and cocaine and arrested two persons. On May 12, 1989, the police observed Clifton Skillern leaving the house.

Much of the government's case against Clifton rested on the testimony of Arnold Porter, an agent of the Texas Alcoholic Beverage Commission who participated in an undercover operation targeting Steven Skillern. On June 28, 1989 at 10:30 a.m., Porter and Duane Lowe, an informant for the government, were sitting in a Toyota outside a Waco apartment complex. Wilton Rollins, an unindicted co-conspirator of the Skillerns, walked up to the car in which Porter and Lowe were sitting and asked Porter and Lowe what they were looking for. According to the uncontradicted testimony of Duane Lowe, Clifton was across the street from Rollins during Rollins' conversation with Porter. A black Jaguar owned by Steven Skillern was parked on the street on which Rollins was standing.

According to the written police report made by Porter after the undercover transaction, the first conversation between Rollins, Lowe, and Porter took place as follows. Lowe informed Rollins that Lowe and Porter were looking for Steven Skillern. Rollins responded that Steven Skillern was at his apartment, but that Rollins might be able to assist Porter and Lowe by going to Steven Skillern's apartment and getting whatever Porter and Lowe wanted. Lowe then told Rollins that he wanted to buy a half ounce of cocaine. Rollins replied that Rollins would have to speak with Steven Skillern to arrange the sale of the

cocaine. Rollins then arranged to meet Porter and Lowe in front of Chapman's grocery store in Waco at 12:30.

On direct examination, Porter did not distinguish between Clifton Skillern and Wilton Rollins in describing this first conversation between Lowe, Porter, and Rollins. Clifton's lawyer objected to this lack of specificity but his objection was overruled without explanation. This erroneous ruling has complicated the record. As we will explain, however, a full reading of the record leaves little doubt that Porter was not prepared to testify that his conversations were with Clifton. Porter testified generally that he and Lowe had "a conversation with these two individuals," and that "they" informed Porter and Lowe that "they would have to go to meet with [Steven Skillern] ... to arrange the sale [of 'crack' cocaine]." However, on cross-examination, Porter admitted that his written police report described the conversation as a conversation with Rollins alone—not with Clifton Skillern. Duane Lowe's testimony was explicit. The conversation about the purchase of crack cocaine was with Rollins; Clifton Skillern stood across the street.[1]

At 12:30, Porter and Lowe saw Rollins arrive at Chapman's grocery store in Steven Skillern's black Jaguar. Clifton Skillern was driving, and Porter was seated in the front passenger's seat. Porter once again did not distinguish between Clifton Skillern and Rollins in his testimony concerning this second conversation. He stated on direct examination that he and Lowe "met with Wilton Rollins *and* Clifton Skillern" in front of Chapman's grocery store; that "*they* discussed the arrangements to make sure that I would have the money and be able to pay *them* for this"; that "*they* would ... meet with [Steven Skil-

---

1. On direct examination, Lowe testified as follows:

Q: And, Mr. Lowe, what was the reason or why—why were you meeting with Mr. Clifton Skillern on that date?

Lowe: Well, I didn't exactly talk to Clifton, I talked to Wilton Rollins.

. . . . .

Q: And where was Clifton when that happened?

Lowe: Clifton was standing in the front yard of a house there on the corner of Spring Street.

lern]" while Porter waited at Chapman's grocery store; and that "*they* would call us [Porter and Lowe] back at the pay phone there at Chapman's Grocery" (emphasis added).

Lowe's testimony about the conversation was specific. Lowe stated that he did not speak with Clifton Skillern at all but rather only with Rollins.[2] According to Lowe, Clifton Skillern simply sat next to Rollins in the driver's seat of the black Jaguar, while Rollins spoke to Lowe and Porter through the passenger's window of the car. According to Lowe, Rollins told Lowe and Porter to wait at a pay phone next to Chapman's for a telephone call, while Rollins met with Steven Skillern. Clifton Skillern and Rollins then drove away in the black Jaguar. Clifton Skillern made no further appearances in the undercover operation.

At 1:15, Porter received the expected telephone call from Rollins. Rollins informed Porter that he would deliver the cocaine to Porter at 4:00. At 4:00, Porter testified that he saw Steven Skillern drive past the grocery store several times. According to Porter, Steven Skillern was making "heat runs" to detect any police. An hour later, Rollins finally arrived at Chapman's, this time accompanied by Bernard Johnson, and Porter purchased the half ounce of cocaine for $500.00.

The government also presented testimony that Clifton Skillern had been seen associating with known drug dealers and users and had been seen leaving the apartment of his brother's girlfriend. None of this testimony, however, alleged that Clifton Skillern himself had ever been seen actually possessing, distributing, or using illegal drugs.

Aside from the evidence arising out of the three car searches, the house search, and Porter's undercover operation, the prosecution rested their case against the Skillern brothers on the testimony of Lawrence Johnson, the indicted co-conspirator who agreed to testify for the government pursuant to a plea bargain. Johnson testified that he first met Steven Skillern in August, 1987 and that he began to purchase cocaine from Steven Skillern because Skillern offered lower prices for cocaine than Johnson's Fort Worth connection. According to Johnson, he and Steven Skillern were transporting cocaine from Houston to Waco for sale when they were stopped by the Navasota police in December, 1988.

Johnson testified that he never actually met Clifton Skillern until February, 1989 and that he never saw Clifton actually perform any act that was related to the distribution or possession of any controlled substance. In particular, Johnson conceded that he had no drug-related transactions with Clifton and that Clifton was never present when Johnson engaged in drug-related business with Steven Skillern. In short, he had no proof that Clifton was involved with Steven Skillern's drug-related transactions.

Johnson did testify that he "had an idea" that "[Clifton] was doing business with his brother"[3] and that he believed that he had overheard Clifton and Steven Skillern arguing over whom controlled their drug business.[4]

---

**2.** On direct examination, Lowe testified as follows:

> Q: Okay. When you say "they" talked to you, did you talk to Clifton Skillern?
> Lowe: He was the driver of the car.
> Q: All right.
> Lowe: I talked to Wilton [Rollins].
> Q: All right. But did you talk to Clifton?
> Lowe: No, I didn't.
> Q: All right. Where was he when you were talking to Wilton?
> Lowe: Driver's side of the car.
> Q: Okay. So they were both there together?
> Lowe: Yes.

**3.** Johnson testimony (on direct examination) was as follows:

> Q: Okay. After you had met [Clifton Skillern] and—and knew who he was, did you know what he was doing?
> Johnson: I had an idea what he was doing.
> Q: And what was that?
> Johnson: All I know is, he was doing business with his brother.
> Q: And what kind of business was his brother in?
> Johnson: Selling "crack" cocaine.

**4.** This testimony, also on direct examination, consisted of the following:

## II. Sufficiency of the Evidence Supporting Clifton Skillern's Conviction

Clifton Skillern argues that there is insufficient evidence to support his conviction. We view the evidence in the light most favorable to the government, to determine whether the government proved all elements of the crimes alleged beyond a reasonable doubt. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Lechuga*, 888 F.2d 1472, 1476 (5th Cir.1989). The evidence is sufficient to support the conviction if a rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt. *United States v. Ayala*, 887 F.2d 62, 67 (5th Cir.1989). To establish guilt of a drug conspiracy under 21 U.S.C. § 846, the government must prove (1) the existence of an agreement to import or possess controlled substances with intent to distribute them; (2) the defendants' knowledge of the agreement; and (3) the defendants' voluntary participation in the agreement. *United States v. Alvarado*, 898 F.2d 987, 992 (5th Cir.1990).

We find that the evidence is insufficient to sustain Clifton Skillern's conspiracy conviction. The only evidence implicating Clifton Skillern was (1) Arnold Porter's testimony concerning his undercover drug transaction; (2) a Waco police officer's testimony that he saw Clifton Skillern leave his brother's girlfriend's residence; (3) testimony concerning Clifton Skillern's association with drug dealers and users; and (4) Lawrence Johnson's testimony that Clifton Skillern was involved in his brother's drug business and had once argued with his brother about who owned that business. None of this evidence showed anything more than that Clifton Skillern associated with members of a drug conspiracy and that one member of that conspiracy speculated that Clifton might be a member of that conspiracy.

Clifton Skillern made only two appearances in Arnold Porter's testimony describing the undercover operation. First, when Porter first approached Rollins, Clifton Skillern was a visible bystander. Second, when Rollins first met Porter at Chapman's grocery store, Clifton Skillern was driving the car in which Rollins sat.

Clifton Skillern's appearances in Arnold Porter's undercover drug transaction are insufficient to show that he participated in any drug conspiracy. Porter did not distinguish between Clifton Skillern and Rollins; he stated generally that "they" spoke to Lowe and Porter in front of the Waco apartment complex and later in front of Chapman's grocery. The prosecutor persisted on direct examination in eliciting general responses that "they" arranged a drug transaction with the undercover agent and government informant, an error sustained by the district court. In short, Clifton can be drawn into the conspiracy only by attributing conduct to Clifton from Porter's testimony on direct examination when Porter did not specify whether he was talking about Clifton or Rollins, or both. It is clear that Porter's use of "they" did not mean both but was a speech pattern that used non-specific references coincidentally vague when the government's case was most weak. We do not insist on particular phrasing. We do insist that artful phrasing cannot suffice for proof.

On this record, these general references will not support a conspiracy conviction. Porter's own written police report stated that Rollins alone actually spoke to Lowe and Porter in front of the apartment complex. Lowe's testimony confirmed this report. His uncontradicted testimony was that Clifton Skillern was standing across the street from Rollins, Lowe, and Porter,

Q: The people that were talking is [sic] Clifton Skillern and Steven Skillern, is that correct?
Johnson: Yes, sir.
Q: And what were they talking about?
Johnson: Well, at the time they was [sic]—I believe he was arguing over—"Heavy D" [Steven Skillern's nickname] was telling his brother, at the time, "You don't run nothing, I run this," and et cetera. they was, I believe, fussing over some—over some business that they had.
Q: Okay. And you're talking about business, you're talking about the drug business?
Johnson: Yes, sir.

when the latter three spoke for the first time.

Likewise, Lowe, a government witness, testified that only Rollins actually spoke to Lowe and Porter when Clifton Skillern made his second appearance in the undercover operation by driving Rollins to Chapman's grocery store. The government relied on Lowe's testimony, and Porter never explicitly contradicted it.

Clifton did drive Rollins to Chapman's grocery. While such presence is unquestionably suspicious and is a valid basis for concern by the agents, we are left only with speculation that Clifton Skillern knew Rollins' reasons for stopping at Chapman's grocery before Rollins' conversation with Porter through the car window. The government's best argument is that the jury could have inferred that Clifton overheard Rollins' remarks to Lowe and Porter, once Rollins began to speak to each other in front of Chapman's Grocery Store. This places Clifton in a suspect "climate of activity," *United States v. DeSimone*, 660 F.2d 532, 537 (5th Cir.1981), but that placement is insufficient to show participation in a conspiracy.

Lawrence Johnson's testimony is insufficient to support Clifton Skillern's conviction because it consisted entirely of Johnson's unsupported conjectures about Clifton Skillern. He stated that he "had an idea" that Clifton Skillern was involved in his brother's drug business—but he never offered any grounds for this "idea", and he conceded on cross-examination that he had no personal knowledge of Clifton's participation in the drug business.

Likewise, Johnson testified that he "believed" that he had overheard Clifton and Steven Skillern arguing about who controlled their drug business—but the only words that he testified actually overhearing were Steven Skillern's retort, "you don't control nothing. This is my thing." Apparently, Johnson interpreted "nothing" and "my thing" to mean Steven's drug business. But Johnson never gave any factual basis for this interpretation. Johnson's interpretation of the brothers' argument was apparently based only on his

general impression that Clifton Skillern was involved in his brother's drug business.

We reverse the conviction of Clifton Skillern. The sufficiency of the evidence that Clifton Skillern was a member of the conspiracy presents an exceedingly close question. We are well aware of the havoc caused by drugs and the massive effort of government to rid our communities of this pestilence. The law of conspiracy has not changed, however, and we remain equally aware of its potent bite and its potential for suggesting guilt by association. Finally, we reject Porter's transparent effort to reach Clifton Skillern over open gaps in the proof. Suspicious as we are, we are not persuaded here.

### III. Admission of Ledger into Evidence

■ The Skillern brothers argue that the district court erred in overruling their objections to the admission into evidence of the drug ledger seized from the residence of Steven Skillern's girlfriend. The ledger was unsigned, and the government introduced no testimony concerning the handwriting in the ledger. The Skillern brothers argue that no evidence linked the ledger to Steven Skillern other than the fact that it was found in his girlfriend's apartment, where he also stayed.

We need not address the issue of whether the ledger was in fact inadmissible. Any error was harmless because it did not affect Steven Skillern's substantial rights. Fed.R.Crim.P. 52(a); *United States v. McDonald*, 905 F.2d 871, 876 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 566, 112 L.Ed.2d 572 (1990); *Muzyka v. Remington Arms Co., Inc.,* 774 F.2d 1309 (5th Cir. 1985). The prosecution's case against Steven Skillern is overwhelming without the admitted evidence.

### IV. Impoundment and Inventory of Johnson's Automobile

Steven Skillern contends that the district court erred in not suppressing evidence obtained from the inventory of Johnson's automobile by the Navasota police department, after the police department impound-

ed Johnson's car. He makes two arguments. First, he argues that the prosecution never produced written police department regulations justifying the inventory search. Second, Skillern argues that the police officer's decision to impound the car was unreasonable, because the police officer did not ask Johnson if Johnson wanted a passenger to take custody of the car. We find that neither the inventory nor the impoundment violated the Fourth Amendment.

A valid inventory of an impounded car's contents is an exception to the requirement that the police may conduct searches only pursuant to a valid warrant. *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 367–68, 96 S.Ct. 3092, 3096–97, 49 L.Ed.2d 1000 (1976); *Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). If an inventory is part of a bona fide "routine administrative caretaking function" of the police, *Opperman*, 428 U.S. at 370 n. 5, 96 S.Ct. at 3097 n. 5, and is not a pretext to disguise an impermissible search for incriminating evidence, *United States v. Johnson*, 815 F.2d 309, 315 (5th Cir.1987), *cert. denied*, 484 U.S. 1068, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988), probable cause is not required. *Bertine*, 107 S.Ct. at 741. The Fourth Amendment only requires that such a good faith inventory be consistent with reasonable, standardized police procedures. *United States v. Young*, 825 F.2d 60, 61 (5th Cir.1987), *cert. denied*, 485 U.S. 1012, 108 S.Ct. 1483, 99 L.Ed.2d 711 (1988).

Skillern points out that the prosecution did not produce written copies of the regulations confirming police policy. However, the prosecution did produce testimony by Officer McNew that the Navasota police department's standard operating procedure was to conduct inventories of all the property held in the unlocked areas of impounded vehicles, so that the police department cannot be held liable for valuables that are left in the vehicles. Skillern does not deny that such inventories were, in fact, standard procedure of the police department. Indeed, Skillern's own brief concedes that

the vehicle was inventoried "pursuant to police department policy." Nor does he argue that the police department did not comply with these procedures: the cocaine base found in the car was lying on the car floor under an open satchel in an untied plastic bag.

Skillern seems rather to be contending that, under this court's decision in *United States v. Judge*, 846 F.2d 274 (5th Cir. 1988), the prosecution must produce *written* police procedures in order to establish that the police department complied with its own regulations in conducting an inventory. *Judge*, however, imposes no requirement that the prosecution prove compliance with regulations by producing the written regulations themselves. *Judge* held only that the prosecution must produce some evidence, not necessarily written, that the DEA did in fact comply with its own regulations. Indeed, the *Judge* court implicitly noted that oral proof would be adequate when it faulted the prosecution for "fail[ing] during trial to present *testimony* that the agents relied upon standardized criteria" in conducting their putative inventory. *Judge*, 846 F.2d at 276 (emphasis added).

Skillern's second challenge to the district court's admission of the challenged inventory evidence is similarly groundless. Johnson did not request the police to give custody of the car to a passenger, although Officer McNew testified that he would have turned Johnson's car over to whomever Johnson designated. Skillern argues that this was unreasonable—that police have an affirmative duty to avoid taking the car into custody.

*Bertine* explicitly rejected this argument. The Colorado Supreme Court had found that the police violated Bertine's Fourth Amendment rights, in part "because Bertine himself could have been offered the opportunity to make other arrangements for the safekeeping of his property" besides impoundment. *Bertine*, 479 U.S. at 373, 107 S.Ct. at 742. The U.S. Supreme Court held that the police had no obligation to offer Bertine such an opportunity, stating that, while such an offer "would un-

doubtedly have been possible," it was not required by the Fourth Amendment. *Id.*

Skillern offers no evidence that the Navasota police department departed from any policy in not informing Skillern of options other than impoundment. According to Skillern, Officer McNew's testimony that he would have given the car to a passenger had Johnson requested such action, implies that there was a department policy requiring McNew to inform Johnson that Johnson could so designate a driver for the car. We fail to comprehend this inference, much less accept it as evidence that the district court erred in finding that McNew obeyed department regulations.

The judgment of the district court is AFFIRMED as to Steven Skillern. The judgment of the district court is REVERSED as to Clifton Skillern.