REVISED, September 3, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-50698

_____

UNITED STATES OF AMERICA,

                          Plaintiff-Appellee,

v.

ALEXIS A LAGE; JOSÉ A LUZARDO; ALBERTO DIAZ,

                          Defendants-Appellants.

_____

Appeals from the United States District Court
for the Western District of Texas
_____

July 29, 1999

Before KING, Chief Judge, and SMITH and BARKSDALE, Circuit
Judges.

KING, Chief Judge:

     Defendant-appellant Alexis A. Lage appeals his convictions
for conspiracy to commit theft of an interstate shipment in
violation of 18 U.S.C. § 371 and theft of an interstate shipment
in violation of 18 U.S.C. § 659.  Defendant-appellant José A.
Luzardo appeals his convictions and sentence for the same
offenses.  Defendant-appellant Alberto Diaz appeals his
conviction for theft of an interstate shipment.  We affirm.

## I.  FACTUAL AND PROCEDURAL HISTORY

     This case concerns the theft of an interstate shipment of
computers.  On September 4, 1997, a trailer loaded with Dell
computer parts was placed on a street in Austin, Texas to await

transport to Latham, New York.  When a truck arrived at 12:15 a.m. on September 5, 1997 to pick it up, the trailer was missing.  Although the theft was promptly reported to the Austin police, they received no leads on the case until September 10, 1997.

At about 12:30 a.m. on that day, Ronald Stone, a trooper with the Texas Department of Public Safety's License and Weight Service, observed an orange Peterbilt truck towing a trailer, followed closely by a purple Freightliner truck with no trailer, traveling east on Interstate Highway 10 (I-10) in Caldwell County, Texas.  Stone stopped the purple Freightliner because its lack of a trailer and proximity to the Peterbilt was "unusual," and asked the driver, defendant-appellant Alexis A. Lage, for his driver's license, registration, and logbook.  Although Lage produced a Florida commercial driver's license, Stone determined that he possessed neither a logbook nor registration to drive a commercial vehicle in Texas.  Because truckers traveling short distances are not required to keep a logbook, Stone asked Lage where he had begun his trip.  Lage replied in broken English that he was traveling from Dallas, where he had spent three days looking for work, to Miami, Florida.  Stone found this account odd because Caldwell County is not on the most direct route from Dallas to Miami and called Jesse Deleon, a Spanish-speaking state trooper, to help him communicate with Lage.  Through Deleon, Stone informed Lage that he would need to post a bond in the amount of $195.00 to cover the citations for failing to possess a logbook and proper registration.  Lage told Stone that he had no

2

money, but that his friend in the orange Peterbilt had both the logbook and money to post bond and that this friend would be waiting at the next rest stop.

Leaving Deleon with Lage and his passenger, defendant-appellant José A. Luzardo, who told Deleon that they were traveling alone, Stone proceeded to the rest stop to find Lage's "friend." As he entered the rest stop, he heard an individual ask over the citizen's band (CB) radio whether the purple Freightliner was still pulled over. Stone responded in the affirmative and asked if the speaker was in the orange Peterbilt. The speaker answered "yes." When Stone pulled up next to the Peterbilt, which was parked at the rest stop, and shone a light inside, he saw defendant-appellant Alberto Diaz talking on the CB radio. Diaz immediately dropped the radio microphone, dashed into the truck's sleeping compartment, and pulled a curtain closed behind him. Stone knocked repeatedly on the cab door and, when he received no response, called for backup.

After Fayette County Deputy Sheriff Donald Roberts arrived on the scene, Diaz and Armando Pedroso emerged from the cab.[1] Diaz admitted that he was traveling to Miami but denied that the driver of the purple truck, whom he claimed he had only met over

---

[1] There was some evidence at trial that Diaz either attempted to appear as though he had been sleeping or actually had been asleep just before he exited the truck. Stone stated that "the subject Diaz stuck his head out of the sleeper and looked over at me. And at that time his hair was all messed up. Before it was wasn't [sic] all messed up--looking like he was asleep." Roberts stated on cross-examination that when Diaz stepped out of the truck, he was barefoot, and his hair "was kind of messed up."

3

the CB radio, was his "friend." Stone asked for his bill of lading, but Diaz produced only a packing slip indicating that his cargo weighed twenty-one pounds and was being shipped via United Parcel Service (UPS) to "M-A," which Stone interpreted to mean either Maryland or Massachusetts. Stone then asked Diaz whether he was a UPS employee and where the shipment was going. Diaz responded that he was working "for them." He also agreed to post bond for the driver of the purple truck. At that point, Stone requested permission to search Diaz's vehicle and received written consent to do so. Upon entering the truck, Stone discovered Reydell Oviedo and a number of Dell computer boxes stacked in a disorderly fashion. He then asked the occupants of the orange Peterbilt, along with Deleon, Lage, and Luzardo, to accompany him to the Fayette County Fairgrounds in La Grange, Texas, for further investigation. After contacting Dell and UPS and confirming that the computers in the orange Peterbilt had been stolen, Stone placed Lage, Luzardo, Diaz, Pedroso, and Oviedo under arrest. With Roberts's assistance, he also searched the purple truck and discovered a fuel receipt from the Dorsett 221 truck stop, a UPS shipping document, a Dell packing slip, and a set of metal trailer seals matching those on the Peterbilt trailer.

A subsequent investigation revealed a great deal more about the Dell computer theft. First, after the events described above, the Hays County, Texas Sheriff's Department found the stolen Dell trailer behind a Conoco gas station near Buda, Texas,

4

its identifying numbers obscured with white paint and a plastic sign. Oviedo's fingerprint was discovered on the trailer. Second, Officer Joe Nichols of the Austin Police Department went to the Interstate Inn near the Dorsett 221 truck stop, where at least one of the trucks had fueled, to see if the clerk, Doris Alexander, recognized any of the five arrestees. Alexander confirmed that Lage, Luzardo, Pedroso, and Oviedo had stayed at the Interstate Inn. According to Alexander, one morning in the early part of September 1997, Luzardo and Oviedo asked to rent a room, but she had none available and told them to come back later. At about 11:30 a.m., Lage and Pedroso rented a room, but Lage and Oviedo returned shortly afterward wanting to move to the south side of the motel so that they could see their truck. According to Alexander, the four men stayed at the Interstate Inn for four days, she saw them several times a day strolling about the motel, and Lage usually paid for the rooms in cash. In addition, Nichols interviewed Ezra Pagel, a clerk at a liquor store near the Conoco where the stolen trailer was found. Pagel recalled that Pedroso and Diaz came to his store on September 9, 1997 and asked to use the phone to page someone. Pedroso asked where he could park a trailer, and Pagel suggested that he do so at the Conoco across the street. The men then told Pagel that if anyone responded to their page, they would be "down the street," staying at the "Dorsett 221."

Nichols also went to an address written on a slip of paper found among Oviedo's possessions when he was booked into jail.

5

At that location, he found a warehouse where, after obtaining and executing a search warrant, he discovered over one hundred boxes of Dell computer parts that later were confirmed as being part of the stolen shipment. Clifton Zachary, an Austin real estate broker, had leased the warehouse after hearing from one of his associates that an individual named José Matos was looking for warehouse space. Zachary contacted Matos, who represented himself to be the owner of La Tuna Furniture in Miami. Matos stated that he needed a warehouse with eighteen-foot clearance and a loading bay to be used for furniture distribution and gave Zachary a pager number for his Austin representative, Frank or Francisco, with whom Zachary set up an appointment to show the Austin warehouse. On September 3 or 4, Zachary met at the warehouse with three men who arrived in an eighteen-wheeler truck. One was an unidentified man whom Zachary took to be Frank or Francisco. The others were Lage and Luzardo. The three men agreed that the warehouse was suitable for their purposes, and Zachary contacted Matos in Miami to tell him that he needed a financial statement in order to execute a lease. Upon receiving a financial statement by facsimile, Zachary faxed the lease to Matos, who signed and faxed it back to Zachary. The next day, Zachary gave Luzardo and the unidentified man whom Zachary had assumed to be Frank or Francisco the warehouse key. At that time, Luzardo paid the rent with money orders that he signed "Francisco."

Nichols also spoke with Andres Ochoa, a warehouse worker who spoke with Lage, Luzardo and the unidentified man for some thirty minutes on the day that they came to inspect the warehouse. Ochoa identified Lage and Luzardo as two of the three men who arrived in an eighteen-wheeler truck on September 3 or 4 and characterized Luzardo as "the most important" member of the group.

Further investigation in Florida revealed more details about the theft. Law enforcement officials discovered, for example, that one Roberto Quevado had presented Joseph Lima, a Miami accountant, with documents purporting to describe La Tuna Furniture's financial situation and asked him to prepare the statement that was faxed to Zachary. Quevado told Lima that Matos was his partner and that he needed the statement to obtain a loan. Investigators also found that Diaz, accompanied by Pedroso, had borrowed the orange Peterbilt from Guillermo Echevarria in order to pick up something having to do with "tuna." Finally, an FBI agent went to the various addresses Matos gave for La Tuna Furniture and found them to be either single-family residences or non-existent. Nor did he ever find Matos.

On October 7, 1997, a grand jury charged Lage, Luzardo, Diaz, Pedroso, and Oviedo with one count each of conspiracy to commit theft of an interstate shipment in violation of 18 U.S.C. § 371 and theft of an interstate shipment in violation of 18 U.S.C. § 659. Oviedo pleaded guilty, and the other defendants

7

proceeded to trial. The jury convicted Lage and Luzardo of both counts against them, convicted Diaz only of theft, and acquitted Pedroso altogether. The district court sentenced Lage to concurrent sentences of thirty months in prison, Luzardo to concurrent sentences of forty-eight months in prison, and Diaz to twenty-four months in prison. Lage and Diaz appeal their convictions. Luzardo appeals both his convictions and sentence.

## II.  DISCUSSION

### A.  Lage

Lage's only challenge to his conviction is that the introduction of evidence discovered during Stone and Roberts's inventory search of the purple Freightliner violated his Fourth Amendment rights. Before trial, Lage filed a motion to suppress, which the district court denied after a hearing, finding that "the evidence obtained from the purple semi was collected pursuant to a valid routine inventory search." On appeal, Lage contends that while a warrantless inventory search is permissible if conducted in accordance with standardized regulations and procedures, there was no evidence that Stone and Roberts in fact followed such rules. Therefore, Lage maintains, the district court should have suppressed the evidence obtained as a result of the inventory search. We disagree.

When a defendant-appellant challenges a district court's denial of a motion to suppress evidence allegedly obtained through an illegal search, we review the lower court's factfinding for clear error and its conclusion as to the

8

reasonableness of the search de novo.  See United States v. Andrews, 22 F.3d 1328, 1333 (5th Cir. 1994).  We view the evidence at both the suppression hearing and the trial in the light most favorable to the prevailing party.  See United States v. Ponce, 8 F.3d 989, 995 (5th Cir. 1993).

Under the Fourth Amendment, warrantless searches are presumptively unreasonable.  See Horton v. California, 496 U.S. 128, 133 (1990).  There is, however, an exception to the warrant requirement when a law enforcement officer conducts an inventory of seized property if that inventory is part of a bona fide police "routine administrative caretaking function."  United States v. Skillern, 947 F.2d 1268, 1275 (5th Cir. 1991).  Under these circumstances, the Fourth Amendment requires only that an inventory not be a "ruse for a general rummaging in order to discover incriminating evidence."  United States v. Walker, 931 F.2d 1066, 1068 (5th Cir. 1991) (internal quotation marks omitted).  "In order to prevent inventory searches from concealing such unguided rummaging, [the] Supreme Court has dictated that a single familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront."  Id. (internal quotation marks omitted).

Thus, an inventory search of a seized vehicle is reasonable and not violative of the Fourth Amendment if it is conducted pursuant to standardized regulations and procedures that are

9

consistent with (1) protecting the property of the vehicle's owner, (2) protecting the police against claims or disputes over lost or stolen property, and (3) protecting the police from danger.  See United States v. Hope, 102 F.3d 114, 116 (5th Cir. 1996).  There is no requirement that the prosecution submit evidence of written procedures for inventory searches; testimony regarding reliance on standardized procedures is sufficient, see United States v. Como, 53 F.3d 87, 92 (5th Cir. 1995), as is an officer's unrebutted testimony that he acted in accordance with standard inventory procedures, see United States v. Bullock, 71 F.3d 171, 178 (5th Cir. 1995).

Our review of the record convinces us that there is ample evidence that the inventory search was conducted according to standardized procedures.  At the suppression hearing, Stone stated that he and Roberts conducted an inventory search of the purple Freightliner after placing the defendants under arrest. The following exchange took place between Stone and the prosecutor:

> Q.  And is that routine if you place somebody under arrest, that you do an inventory search?
>
> A.  Yes, sir, for liability purposes.
>
> Q.  And when you say "liability," what do you mean?
>
> A.  If there's something missing, I can have note that I inventoried that it was there or where it went to.

This testimony establishes that the inventory search of the purple Freightliner was a routine post-arrest procedure designed to protect the vehicle's owner from property loss and the law

10

enforcement agency from claims for lost or stolen items.  Later in the suppression hearing, Stone explicitly testified that he conducted the inventory search in accordance with standardized procedures:

> Q. [by Lage's counsel]  The inventory that was conducted, did you conduct the inventory yourself?
>
> A.  Yes, sir.
>
> Q.  Did you do that in accordance with DPS policies and guidelines?
>
> A.  Yes, sir.
>
> Q.  And was that done after Mr. Lage was arrested or before he was arrested?
>
> A.  It was after.

In light of this unchallenged testimony, we cannot say that the district court's finding that Stone acted in accordance with standard inventory procedures was clearly erroneous.  Compare Bullock, 71 F.3d at 178 ("The officer's unrebutted testimony is sufficient to establish that he acted in accordance with standard inventory procedures."), with Hope, 102 F.3d at 117 (stating that Bullock's "minimal threshold was not met in the case at bar where we find no testimony that referred to Memphis police department guidelines, or that they were followed, but only the statement by the officer that, 'I believe the Memphis police did inventory the vehicle'").

Nor does Roberts's testimony convince us that the inventory search in this case violated the Fourth Amendment.  On direct examination, Roberts testified as follows:

11

Q. Ultimately did you participate in the inventory search of the purple Freightliner?

A. Yes, sir.

Q. What was the purpose of conducting this inventory search of the purple Freightliner?

A. For the reason of--we inventory all vehicles for the reason to have a list of things of value if the vehicle is locked up so it's not removed and someone gets blamed for taking things out of the vehicle.

Later, the following colloquy between Roberts and Lage's counsel ensued:

Q. Now, the inventory that was conducted of that purple Freightliner, was that done by you?

A. I assisted in it.

Q. Did you do that?

A. Yes, sir.

Q. Does Fayette--does the Fayette County Sheriff's Department have any regulations or rules with respect to inventorying vehicles?

A. No, sir. It was to the fact of--you mean do we have a set of ground rules that we go by?

Q. Absolutely.

A. Yes, sir. To an extent it's basically done for our protection, you might say.

Q. Is that done--I guess what I'm asking you is, have they promulgated rules? Has the Fayette County Sheriff's Department promulgated rules with respect to inventory searches?

A. There's--no, sir, not to my knowledge.

Q. So it would be fair to say that the inventory search of this vehicle was not done pursuant to a promulgated set of rules.

A. I guess you're correct in saying that.

12

Even in light of this testimony, we cannot say that the district court's finding that the evidence obtained from the Freightliner was collected pursuant to a "valid routine inventory search" was clearly erroneous. Roberts merely "assisted" Stone in conducting the inventory search, and the evidence shows that the search was conducted in accordance with the policies and procedures of Stone's agency, the Texas Department of Public Safety. Because the inventory search was conducted pursuant to standardized practices and procedures, it was not an unreasonable search in violation of the Fourth Amendment.

## B. Luzardo

Luzardo challenges both his convictions and his sentence. With respect to the former, he contends that the evidence adduced at trial is insufficient to support his convictions for conspiracy to commit theft of an interstate shipment and theft of an interstate shipment, as it showed at most that he was a passenger in the purple Freightliner. As for his sentence, Luzardo argues that the district court clearly erred in finding that he was a leader in a conspiracy involving five or more participants and that the offense involved more than minimal planning. We address these contentions in turn.

### 1. Sufficiency of the Evidence

We review a claim that the evidence is insufficient to support a conviction in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the jury. See United States v. McCord, 33 F.3d 1434, 1439

13

(5th Cir. 1994).  We must uphold the conviction if a rational jury could have found that the government proved the essential elements of the crime charged beyond a reasonable doubt.  See United States v. Soape, 169 F.3d 257, 264 (5th Cir.), cert. denied, 119 S. Ct. 2353 (1999).  It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.  See United States v. Lopez, 74 F.3d 575, 577 (5th Cir. 1996).  This standard of review is the same regardless of whether the evidence is direct or circumstantial.  See United States v. Cardenas, 9 F.3d 1139, 1156 (5th Cir. 1993).

To establish a violation of 18 U.S.C. § 371, which forbids criminal conspiracies, the government must prove beyond a reasonable doubt (1) that two or more people agreed to pursue an unlawful objective, (2) that the defendant voluntarily agreed to join the conspiracy, and (3) that one or more members of the conspiracy committed an overt act to further the objectives of the conspiracy.  See United States v. Campbell, 64 F.3d 967, 974 (5th Cir. 1995).  Moreover, the government must prove "at least the degree of criminal intent necessary for the substantive offense itself."  United States v. Osuneqbu, 822 F.2d 472, 475 (5th Cir. 1987).  In order to establish theft of an interstate shipment in violation of 18 U.S.C. § 659, as charged in the indictment, the government must show that Luzardo stole, unlawfully took, carried away, or concealed items that were part

14

of an interstate or foreign shipment of freight, with the intent to convert them to his own use.  See 18 U.S.C. § 659.

After a careful review of the record, we believe that there is sufficient evidence to support both of Luzardo's convictions. As we recounted above, Stone identified Luzardo as the passenger in the purple Freightliner, which was traveling in close proximity to the orange Peterbilt carrying the stolen computers. The Freightliner was registered to Oviedo, a passenger in the orange Peterbilt whose fingerprint was on the stolen Dell trailer.  In addition, Deleon testified that Luzardo stated that he and Lage were not traveling with anyone, but Lage claimed to have a friend in the orange Peterbilt.  Luzardo also met several times with Zachary, the real estate broker who rented the warehouse in which stolen computers were found.  In the course of those meetings, he accepted the key to the warehouse and paid the rent with money orders on which he signed his name as "Francisco" and indicated that his address was "3055 NW 19th St FL."  Luzardo was so active in his dealings with Zachary that Ochoa, a warehouse worker, described him as "seem[ing] more important or talk[ing] more" than the other two men.  Finally, Luzardo was seen with Lage, Pedroso, and Oviedo at a motel after the theft, where two of his companions asked for a room from which they could see their trailer.  The evidence also demonstrates that around the same time, Pedroso asked a liquor store clerk where he could store his trailer, and the clerk pointed out a location where the stolen Dell trailer later was found.

15

There are, of course, innocent explanations for Luzardo's behavior.  For example, Luzardo <u>could</u> have been unaware that Oviedo, with whom he had spent the last few days at a motel, was only a few yards ahead of him in another truck and that, for some time, he had been in possession of a trailer full of stolen computers so important to him that he asked for a room change.  It is also theoretically possible that Luzardo, a resident of Florida, came to Texas, engaged in negotiations to rent a warehouse, signed money orders with a false name and address, and went on a cross-country truck drive with a load of computers as a favor to his friends, believing that their request that he do so was completely innocent.  But factfinders may properly "use their common sense" and "evaluate the facts in light of the natural tendencies and inclinations of human beings."  <u>United States v. Ayala</u>, 887 F.2d 62, 67 (5th Cir. 1989) (citation and internal quotation marks omitted).  A rational jury could have concluded that a person who is not engaged in both a conspiracy to commit theft of an interstate shipment and the substantive crime itself generally does not travel with stolen merchandise for days at a time, insist that he is not traveling with the owner of the truck in which he is riding when that person is immediately ahead of him in a similar vehicle and his companion says that a person in the truck ahead is a "friend," engage in lengthy negotiations to rent a warehouse in which his associates store large quantities of stolen goods, and sign rent checks under an assumed name and

16

address.  The evidence was sufficient to support Luzardo's convictions.

**2.  Sentencing Issues**

**a.  Section 3B1.1(a)**

Section 3B1.1(a) of the Sentencing Guidelines Manual provides for a four-level offense level increase for a defendant who is an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. See U.S. SENTENCING GUIDELINES MANUAL § 3B1.1(a) (1997).  The commentary defines "participant" as a person who is criminally responsible for the commission of the offense, but the person need not have been convicted.  See id. application note 1.  We review the district court's finding that a defendant is an organizer or leader under § 3B1.1(a) for clear error.  See United States v. Izydore, 167 F.3d 213, 224 (5th Cir. 1999).  Factual findings are not clearly erroneous if they are plausible in light of the record as a whole, see United States v. Whitlow, 979 F.2d 1008, 1011 (5th Cir. 1992), although there must be an acceptable evidentiary basis for the court's factfindings at the sentencing hearing, see United States v. Ayala, 47 F.3d 688, 690 (5th Cir. 1995).

We conclude that the district court's finding that Luzardo was a leader of a criminal activity involving five or more

17

participants was not clearly erroneous. We first note that Luzardo has never contested that the criminal activity of which he was convicted involved five or more participants. Rather, he argues only that he was not a leader of that activity. In determining whether a defendant is a leader, a court should consider the following factors: "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S. SENTENCING GUIDELINES MANUAL § 3B1.1 application note 4; United States v. Navarro, 169 F.3d 228, 235 (5th Cir. 1999), petition for cert. filed, --- U.S.L.W. --- (U.S. June 1, 1999) (No. 98-9659).

In this case, the presentence investigation report (PSR), as revised in response to the government's objections, found that he was eligible for a § 3B1.1(a) adjustment. A PSR generally bears sufficient indicia of reliability to permit the sentencing court to rely on it at sentencing. See United States v. Gracia, 983 F.2d 625, 629 (5th Cir. 1993). Indeed, the defendant bears the burden of demonstrating that the PSR is inaccurate. See Ayala, 47 F.3d at 690. Although Luzardo testified at his sentencing hearing and insists in his appellate brief that he was not a leader, the government pointed out at sentencing that Zachary had identified Luzardo as the individual who signed the rent checks

18

and that Ochoa had described Luzardo as seeming more important or talking more than the other men who came to look at the warehouse.  This evidence supports an inference that Luzardo possessed some decisionmaking power, participated extensively in the crime, and exercised control and authority over his co-conspirators.  We think that the district court's conclusion that Luzardo was a leader was plausible in light of the record as a whole, see Whitlow, 979 F.2d at 1011, and we therefore decline to find clear error.

### b.  Section 2B1.1(b)(4)

Section 2B1.1(b)(4) of the Sentencing Guidelines directs the sentencing court to increase a defendant's offense level by two levels "[i]f the offense involved more than minimal planning." U.S. SENTENCING GUIDELINES MANUAL § 2B1.1(b)(4).  The Guidelines define "more than minimal planning" as "more planning than is typical for commission of the offense in a simple form."  Id. § 1B1.1 application note 1(f).  Whether a defendant engages in more than minimal planning is a fact question reviewed under the clearly erroneous standard.  See United States v. Barndt, 913 F.2d 201, 204 (5th Cir. 1990).

We find no clear error in the district court's determination that Luzardo's offenses involved more than minimal planning. First, the PSR found that Luzardo's offense involved more than minimal planning on his part and recommended a two-level offense level adjustment under § 2B1.1(b)(4).  As we noted above, Luzardo bears the burden of demonstrating that the PSR is inaccurate.

19

See Ayala, 47 F.3d at 690. He has failed to do so. At sentencing and on appeal, he offers only his own insistence that he engaged in no planning whatsoever. The testimony at trial, however, showed that Luzardo helped examine and approve a warehouse used to store the stolen computers, picked up the warehouse key, and signed rent checks with an assumed name and address. In other words, Luzardo arranged a manner of concealing the theft that required numerous contacts with a real estate broker, the acquisition of money orders, and the use of false information. The commentary to § 1B1.1 indicates that this activity constitutes more than minimal planning:

> In a theft, going to a secluded area of a store to conceal the stolen item in one's pocket would not alone constitute more than minimal planning. However, repeated instances of such thefts on several occasions would constitute more than minimal planning. Similarly, fashioning a special device to conceal the property, or obtaining information on delivery dates so that an especially valuable item could be obtained, would constitute more than minimal planning.

U.S. SENTENCING GUIDELINES MANUAL § 1B1.1 application note 1(f) (emphasis added). We therefore cannot say that the district court clearly erred.

**C. Diaz**

Diaz challenges his conviction for theft of an interstate shipment on only one ground, that the admission of non-testifying codefendant Pedroso's statement violated his Sixth Amendment right to confrontation as explained by Bruton v. United States, 391 U.S. 123 (1968). At trial, Officer Joe Nichols of the Austin Police Department testified that he interviewed Pedroso after his arrest. According to Nichols, Pedroso stated that although he

agreed to travel from Miami to Texas with Diaz in order to learn to operate an eighteen-wheeler truck, he spent most of the trip in the sleeper compartment because he was suffering from a severe headache. He was awake only twice during the journey: At one point, Diaz called an unidentified party on his cellular phone, and Pedroso called his family in Miami. He then returned to the sleeper compartment. Later, he awoke to find the truck "backed into" a warehouse. There, he met an individual known as "Alexis," who identified himself as the warehouse manager. The prosecution then asked Nichols:

> Q. [by counsel] And what did he indicate to you was occurring at this warehouse?
>
> A. That they were loading the boxes into the truck that he was in, and that he inquired to the other people there of why they were loading by hand. Why didn't they have a pallet jack that would make the job much easier.
>
> Q. What if anything did he indicate his participation was in assisting and loading boxes?
>
> A. He would never say that he actually participated a lot in the loading. What he did say was, there were so many boxes--he was standing next to them--that somebody would make the comment, "Hey, hand us one of those."
> And that he said he would just in a response to them asking for his help, he would lift the box, but he didn't actively participate in loading up all the boxes.
>
> Q. And these boxes are the Dell computer boxes that he's talking about, correct?
>
> A. Correct.
>
> Q. Did he indicate how long it took for this loading process to occur, loading the trailer?
>
> A. He stated that it took approximately five to six hours to load the truck.
>
> Q. What did he indicate occurred after the boxes were loaded into the trailer?

21

A.  At that time he got into the truck that he and Mr. Diaz had arrived in.  He turned to Mr. Diaz and asked him, "Where are we going?"

    And Mr. Diaz said--I believe he said home.  And Mr. Pedroso told me he assumed that meant that they were going back to Miami.  At that time Mr. Oviedo jumped into the truck with them, and he said at that time he still wasn't feeling very well, so he got back into the sleeper portion of the truck.

Q.  And did he indicate to you what the circumstances were when he was next awake?

A.  He said the next time he remembers being awakened was, Mr. Diaz jumped on top of him from the driver's portion of the truck into the back portion--sleeper portion of the truck, and he didn't know what was going on.  And the next thing he remembers was that the police were knocking on the exterior portion of the truck.

Nichols also testified that Pedroso later stated that he saw Lage and Luzardo for the first time when they were booked into jail, thus contradicting his earlier assertion that "Alexis" was present at the warehouse.  Prior to trial, Diaz filed a motion in limine to exclude Pedroso's statement.  The district court denied the motion and overruled Diaz's objection at trial to the introduction of the statement, instead instructing the jury in its closing charge to consider a defendant's post-arrest statement only against that defendant.

The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right "to be confronted with the witnesses against him."  U.S. CONST. amend. VI.  In Bruton, the trial court admitted into evidence the oral confession of George Bruton's non-testifying codefendant that he and Bruton committed armed robbery together but instructed the jury not to consider the confession against Bruton.  See 391 U.S. at 124-25.  The Supreme

22

Court held that notwithstanding such an instruction, admission of a non-testifying codefendant's extrajudicial statement violates a defendant's confrontation right:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect . . . . The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination.

Id. at 135-36 (citations omitted). In Richardson v. Marsh, 481 U.S. 200 (1987), the Court considered whether Bruton applies to a non-testifying codefendant statement that has been redacted so as to omit not only the name of the defendant but all reference to her existence. Marsh and her codefendant, Williams, were tried jointly for felony murder. The prosecution introduced Williams's statement that, while traveling together in a car to the victims' residence, he and a third individual decided that they would rob and kill the victims. As we related above, the government deleted all hint of Marsh's existence from this confession. After the state rested, however, Marsh testified that she had not intended to rob or kill anyone and, although she rode to the victims' house with Williams and a third person, she could not hear their conversation because the radio was too loud. See id. at 202-04. The Court distinguished Williams's statement from the "facially incriminating confession" in Bruton and concluded that

23

because "in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony) . . . it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence." Id. at 208. We have interpreted this case law to mean that "Bruton is inapplicable unless the codefendant's statement 'directly incriminates the non-confessing defendant without reference to other, admissible evidence.'" United States v. Mann, 161 F.3d 840, 860 (5th Cir. 1998) (quoting United States v. Espinoza-Seanez, 862 F.2d 526, 534 (5th Cir. 1988)), cert. denied, 119 S. Ct. 1766 (1999).

Our task is therefore to determine whether Pedroso's statement is the sort of powerfully, facially, or directly incriminating statement that Bruton and its progeny concluded a jury could not put out of mind, even when given proper limiting instructions. In Gray v. Maryland, 523 U.S. 185 (1998), the Supreme Court recently said that although Marsh "placed outside the scope of Bruton's rule those statements that incriminate inferentially," the result in that case "must depend in significant part upon the kind of, not the simple fact of, inference." 523 U.S. at 196.[2] Gray concluded that redacted

---

[2]   Indeed, this conclusion is implicit in the reasoning of Marsh itself. There, the Court assumed that Marsh "would have been harmed" if the jury used against her both (1) Williams's statement that he and Martin discussed in the car their intention to kill the victims and (2) Marsh's own testimony that she was riding in the back seat of the car at the time, because these two pieces of evidence could show that Marsh knew beforehand that the victims would be killed. See Marsh, 481 U.S. at 208 n.3. To reach this conclusion, however, the jury would have had to infer

24

statements that merely replace the defendant's name with a blank space or the word "deleted" implicate <u>Bruton</u> because "the inferences at issue . . . involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." <u>Id.</u> "Like the confession in <u>Bruton</u> itself, the accusation that the redacted confession makes 'is more vivid than inferential incrimination, and hence more difficult to thrust out of mind.'" <u>Id.</u> (quoting <u>Marsh</u>, 481 U.S. at 208). Thus, the Supreme Court precedent teaches with respect to some inferentially incriminating statements,

> the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget. In short, while it may not always be simple for the members of a jury to obey the instruction that they disregard an incriminating inference, there does not exist the overwhelming probability of their inability to do so that is the foundation of <u>Bruton</u>'s exception to the general rule.

<u>Marsh</u>, 481 U.S. at 208. Although both <u>Marsh</u> and <u>Gray</u> involved situations in which the non-testifying codefendant's statement did not refer to the defendant by name, such that the inference the jury would have made was whether the defendant was in fact present during the events recounted in the statement, they speak in general terms about inferential incrimination.[3] We therefore

---

Marsh's knowledge from her presence.

[3] We note that many of the cases the government cites to support its argument address whether oblique references to the defendant are powerfully, facially, or directly incriminating so as to trigger <u>Bruton</u> and conclude that they are not because the

25

interpret the language of these cases to apply even when the defendant <u>is</u> named, but the <u>content</u> of the statement is incriminating only if the jury draws certain inferences from it.

With these principles in mind, we turn to Pedroso's statement. Diaz argues that "Pedroso's out-of-court statement did reflect Diaz's guilt" because "it placed Diaz at the scene when stolen computers were being loaded into his truck, and it confirmed Officer Stone's testimony that Diaz's behavior indicated consciousness of guilt." In fact, Pedroso's statement said simply that Diaz backed the truck into the warehouse and drove it away after it was loaded. Pedroso is utterly silent as to Diaz's whereabouts and activities during the loading process. Of course, it is possible that the jury inferred that Diaz

defendant is not explicitly named. <u>See</u> <u>United States v. Leal</u>, 74 F.3d 600, 605-06 (5th Cir. 1996) (concluding that there was no <u>Bruton</u> violation where the district court ordered the redaction of all references to other defendants from non-testifying codefendant's statement); <u>United States v. Cartwright</u>, 6 F.3d 294, 300 (5th Cir. 1993) (rejecting defendant's <u>Bruton</u> argument because his father/codefendant's statement referred to "my kid," not to defendant by name); <u>United States v. Restrepo</u>, 994 F.2d 173, 185-86 (5th Cir. 1993) (finding no <u>Bruton</u> violation where codefendant's extrajudicial statement "never directly mentioned Restrepo" but referred only to the need to rent a warehouse as a drug "caleta," or hiding place, and to hire someone to mind the caleta); <u>United States v. Payan</u>, 992 F.2d 1387, 1393 (5th Cir. 1993) (rejecting defendant's <u>Bruton</u> argument where non-testifying codefendant stated that there were "rich and powerful people involved" in the criminal scheme and defendant's own attorney characterized his family as "people of some wealth" and "some power in the community"). While <u>Gray</u>'s gloss on <u>Marsh</u>'s view of permissible inferential incrimination may require further refinement of the rationale for some of these cases, we did hold in <u>Walker</u> that a codefendant's statement that his "home boy" had lied for him did not directly incriminate the defendant, although other evidence showed that the defendant might have been that person. <u>See</u> <u>Walker</u>, 148 F.3d at 522-23.

26

remained at the scene[4] and decided based on that conclusion that he knew that he would be carrying stolen property.  But while the statement mentions Diaz by name, it is harmful to his defense only if the jury makes several inferential jumps.  Thus, it is not "more vivid" than the inferential incrimination in Marsh, and we do not think that there is here "the overwhelming probability," as there was with the "powerfully incriminating" finger-pointing in Bruton, that the jurors will disobey the instruction to consider the statement against Pedroso but no one else.  Cf. Mann, 161 F.3d at 860 (finding no direct incrimination where codefendant's statement was exculpatory and became potentially inculpatory only when contrasted with defendant's own out-of-court statements); United States v. Jobe, 101 F.3d 1046, 1067 n.28 (5th Cir. 1996) (holding that codefendant's statement that defendant declined to explain his involvement in illegal transaction was not directly incriminating).

---

[4]  We recognize that the government argued repeatedly that the jury should infer from Pedroso's statement that Diaz was present during the loading of the boxes into his truck and that he knew they contained stolen property.  For example, the prosecutor asserted during closing argument:

> Clearly Mr. Diaz knew what was going on.  He was at that warehouse.  And as his lawyer said, an experienced truck driver.  You think he's just standing idly by not seeing what's being loaded into his truck?  Doesn't have anything to do with it?  You think he's just sleeping?  The doors get closed and he drives off?  If that's what you believe, then I guess you can say that Mr. Diaz didn't know anything.

As we explained above, however, Pedroso's statement did not explicitly state that Diaz observed or participated in the loading of his truck, and, as the district court instructed the jury, lawyers' arguments that the factfinders should draw certain inferences from testimony are not evidence.

Pedroso's assertion that he was awakened when Diaz "jumped on top of him from the driver's portion of the truck . . . . And the next thing he remembers was that the police were knocking on the exterior portion of the truck," presents a more difficult question. Even assuming that the admission of this statement violated <u>Bruton</u>, however, it was harmless beyond a reasonable doubt. It is well-established that <u>Bruton</u> error is subject to harmless error analysis. <u>See, e.g.</u>, <u>United States v. Nutall</u>, No. 97-51050, 1999 WL 427631, at *4 (5th Cir. June 25, 1999); <u>United States v. Walker</u>, 148 F.3d 518, 526 (5th Cir. 1998). The reviewing court must consider "not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 279 (1993). The courts have found <u>Bruton</u> error harmless where the erroneously admitted evidence is "merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury." <u>Brown v. United States</u>, 411 U.S. 223, 231 (1973); <u>see</u> <u>United States v. Wilson</u>, 116 F.3d 1066, 1083-84 (5th Cir. 1997) (finding <u>Bruton</u> violation harmless beyond a reasonable doubt because the erroneously admitted evidence was "merely cumulative"), <u>reheard en banc on other grounds sub nom.</u> <u>United States v. Brown</u>, 161 F.3d 256 (5th Cir. 1998); <u>see also</u> <u>United States v. Gillam</u>, 167 F.3d 1273, 1277 (9th Cir. 1999) (finding <u>Bruton</u> error harmless where "the testimony erroneously admitted was merely cumulative of other overwhelming and essentially uncontroverted evidence

properly admitted"); cf. United States v. Smith, 46 F.3d 1223, 1229 (1st Cir. 1995) (concluding that a statement cumulative of other evidence "could not have produced Bruton error").  In this case, Pedroso's statement did no more than corroborate Stone's largely uncontroverted testimony that when he shined his flashlight into the orange Peterbilt, Diaz threw down the CB microphone and jumped into the sleeper compartment.  Diaz's counsel cross-examined Stone as to his ability to see into the truck, but Stone flatly denied that his vision was obstructed or that there was anything more than a factory tint on the window. Moreover, counsel also suggested during cross-examination that Diaz's response to Stone was not evidence of guilty knowledge and, during closing argument, abandoned altogether the theory that Stone was mistaken in his description of Diaz's actions, arguing instead that "it's not uncommon for someone to drop their CB and jump in the back or hide or whatever."  Because Pedroso's assertion that Diaz jumped on him was merely cumulative of Stone's testimony, we conclude that any Bruton error arising from its admission was harmless.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgments of conviction and sentences.