**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 93-8244
Summary Calendar
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

VICTOR CORDERO,
GUSTAVO PACHECO,
and
RUBEN PENALVER PICHARDO,
a/k/a RITO MOLINA,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Western District of Texas
_____
(April 4, 1994)

Before GARWOOD, SMITH, and DeMOSS, Circuit Judges.

PER CURIAM:

Victor Cordero, Gustavo Pacheco, and Ruben Pichardo appeal their convictions of possession with intent to distribute marihuana and conspiracy to possess with intent to distribute marihuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Finding no error, we affirm.

All three defendants challenge the sufficiency of the evidence underlying their convictions. We consider the evidence in the light most favorable to the verdict and determine whether a rational jury could have found the essential elements of the offense beyond a reasonable doubt, giving the government the benefit of all reasonable inferences and credibility choices.[1] Glasser v. United States, 315 U.S. 60, 80 (1942).

At trial, Drug Enforcement Administration ("DEA") agent Steven Whipple testified that a defendant in another case, Brent Gilpin, wished to cooperate with the government and arranged a meeting between Whipple and some narcotics traffickers at a hotel in El Paso. Shortly after Whipple and Gilpin arrived, Cesar Parra and Jorge Varela arrived and were introduced to Whipple by Gilpin. Whipple posed as someone with ties to organized crime who could move large quantities of narcotics through his distribution network.

Whipple negotiated with Parra, and Varela translated. Whipple represented that he could move 2,000 pounds of marihuana through his network on a weekly basis and stated that he was interested in purchasing that quantity. It was agreed that the first transaction would involve only 1,000 pounds. Later, they would supply 2,000 pounds on a weekly basis at a price of $700 per pound.

Parra and Varela told Whipple that they had 250 pounds of

---

[1] The Glasser standard applies because the defendants timely moved for judgment of acquittal. United States v. Pruneda-Gonzalez, 953 F.2d 190, 195 (5th Cir.), cert. denied, 112 S. Ct. 2952 (1992).

marihuana on hand that they wished to show him.  All four men traveled to a location in northeast El Paso.  There, Whipple was introduced to two or three unknown men and to Pacheco.  Whipple asked, "Where's the marijuana?"  Pacheco replied that it was in the garage.  Whipple was shown to the garage, where he was shown four "pretty good size" boxes.  One of the unidentified men helped Whipple open one of the boxes, which contained compressed bricks of "commercial grade" marihuana.

After Pacheco and several of the other men returned to the house, Whipple discovered that there was only 150 pounds of marihuana in the garage.  When confronted, Pacheco, Parra, Varela, and the unidentified men agreed to bring in another 100 pounds to complete the initial 250-pound delivery.  Whipple was advised that the remaining 750 pounds would have to be obtained from other sources.

Whipple agreed to return to his hotel room with Gilpin while arrangements were made to obtain the additional 750 pounds.  While they waited, they had several telephone conversations and another meeting with Parra and Varela.  When Parra and Varela were unable to make arrangements for delivery of the 750 pounds that day, Whipple agreed to give them another day to put the deal together.

Whipple understood that Parra and Varela did not own the marihuana that comprised the initial 1,000-pound delivery.  Their marihuana was still in Mexico.  When Parra and Varela were unable to deliver the additional quantity the next day, Whipple terminated the negotiations and told them to keep trying to put the deal

3

together and to stay in touch with Gilpin. He would give them one more chance.

Ten days later, Gilpin arranged another meeting at a hotel in El Paso. Parra had 1,300 pounds of marihuana for sale. Parra arrived, accompanied by Ramon Gonzales and Pacheco.

Gonzales was the translator. He stated that he had 300 pounds at a location near his restaurant that he wanted to deliver that night. Gonzales would front Whipple the 300 pounds and would take him to another place where he had 800 pounds ready for delivery. Once Whipple paid for the 800 pounds, an additional 250 pounds would be brought in within 20 minutes, for a total quantity of 1,350 pounds at $700 per pound. The men agreed to meet at 5:00 a.m. at Gonzales's restaurant.

At the appointed hour, Whipple and Gilpin went to the restaurant, where they found Gonzales, Parra, and Pacheco waiting. After confirming the details of their agreement, all five men traveled in Whipple's truck to a small house near the restaurant. A person tentatively identified as Arnulfo Yanez was at the house. Whipple was led to a bedroom by Gonzales and was shown marihuana, which all of the men, including Pacheco, proceeded to weigh. The total weight was 296 pounds. The men loaded the marihuana into the truck that had been backed up to the front door.

It was agreed that the men would meet back at Whipple's hotel room an hour later. When Gilpin arrived, Parra, Pacheco, and Gonzales were waiting. When Whipple arrived later, only Pacheco and Gilpin were present. Pacheco told Gilpin that the marihuana

4

had been grown in the mountains of Mexico.  Whipple and Pacheco engaged in small talk until Parra and Gonzales returned, accompanied by defendant Cordero.

Cordero was introduced by Gonzales as someone who had 300 pounds available for sale.  Gonzales suggested that Whipple accompany them to inspect the 300 pounds of marihuana; if it was satisfactory, an additional quantity would be delivered.  Whipple agreed to this, and Gonzales had a conversation with Cordero in Spanish.

Cordero pulled a baggie of marihuana from inside of his shirt and handed it to Whipple.  Gonzales told him it was a sample.  Whipple testified that each batch of marihuana was of the same grade, "the same stuff."

Whipple agreed to purchase the additional marihuana if it was the same quality as the sample.  Whipple smiled at Cordero and gave him a "thumbs-up" gesture; Cordero smiled back and gave Whipple a thumbs-up gesture.  Although these negotiations were primarily between Gonzales, Cordero, and Whipple, the men spoke in a normal tone that everyone could hear.

The men left the hotel and traveled some distance to another location.  Standing outside the house, speaking on a cellular phone, was Pichardo.  Whipple was introduced to Pichardo (identified in the transcript by his alias, Rito Molina), and Pichardo invited everyone into the house.  Another man, Silviano Cordova, was inside the house.

Pichardo stated (through Gonzales as interpreter), "`I have

5

300 pounds across the street,' and said, `If you want that, if it's good, I'll have another 280 pounds here within a couple of minutes.'" Because Cordova's English was better than Gonzales's, Cordova began to act as translator.

The men went to the house across the street, and Cordova backed the truck up to the garage. Another man, Javier Chaves Miramontes, came out of the house and helped direct the truck. Miramontes took them to a bedroom that contained bags of marihuana, which were weighed and totaled 298 pounds of the same quality as the marihuana Whipple had previously been shown. Everyone but Miramontes returned to the first house.

Whipple admitted on voir dire that the defendants were not present in the second house with the marihuana. All three were present, however, when Whipple was negotiating with Cordova. Although Whipple is not fluent in Spanish, he has some knowledge of the language and recognized the other men using the Spanish pronunciation of the word marihuana and the slang term for marihuana, "mota," at Pichardo's house. Everyone present partici-pated, at some point, in the negotiations. It appeared to Whipple that everyone had a "piece of the pie."

Whipple returned to the second house, where he told Cordova that he wanted to purchase the marihuana. Cordova told Whipple that he had an additional 280-to-300-pound quantity in a car nearby; if he liked that, there was an additional 400 pounds on the way. Whipple agreed to wait.

While the men were discussing the purchase price, Pichardo's

cellular phone rang, and Pichardo left the room to take the call, then returned to say that the 280-pound quantity would be delayed. The men agreed that Whipple should leave to get the purchase money. Whipple told the others to load the marihuana into the truck while he was gone.

After Whipple left, the decision was made to proceed with the arrest. Cordero, Pacheco, Pichardo, Parra, Gonzales, and Cordova were arrested at Pichardo's house; the marihuana was seized from the back of Whipple's truck; Miramontes was arrested at the second house; and Varela was arrested at another location.

## II.
### A.

In a drug conspiracy prosecution, the government must prove beyond a reasonable doubt the existence of an agreement between two or more persons to violate the narcotics laws and the defendant's knowledge of, and voluntary participation in, the agreement. United States v. Maltos, 985 F.2d 743, 746 (5th Cir. 1992). To convict for possession, the government was required to prove that the defendants (1) knowingly (2) possessed marihuana with (3) intent to distribute. United States v. Gonzalez-Lira, 936 F.2d 184, 192 (5th Cir. 1991).

"Possession may be constructive if the evidence indicated the defendant[s'] ownership, dominion and control over the" marihuana. United States v. Ornelas-Rodriguez, 12 F.3d 1339, 1346 (5th Cir. 1994). Even without direct evidence of the defendants' ownership,

7

dominion, and control, conspirators are liable for the substantive offenses of their co-conspirators while they are members of the conspiracy. Accordingly, constructive possession may be found on the basis of actual or constructive possession by another member of the conspiracy. Id.

B.

Pacheco concedes the existence of a conspiracy but denies that the evidence showed more than his mere presence. See United States v. Skillern, 947 F.2d 1268 (5th Cir. 1991), cert. denied, 112 S. Ct. 1509 (1992). In Skillern, we found that testimony by an undercover officer that confused the defendant with another co-conspirator was insufficient to demonstrate the defendant's knowledge of and participation in the conspiracy. Id. at 1273. We found that the officer's testimony became purposefully vague in places where the government's case was weak. Id.

In his testimony, Whipple often referred to the co-conspira-tors collectively and in general terms. There is evidence, however, that Pacheco personally participated in the negotiations. It was he who told Whipple where the marihuana was located in response to his question "So okay, where's the marijuana?" Pacheco was the one who told Gilpin that the marihuana had come from the mountains of Mexico. Whipple testified that all of the co-conspirators seemed to be involved in the transaction, had a "piece of the pie," and had pulled together to do this large transaction. Unlike the situation in Skillern, here there was evidence specifi-

8

cally linking Pacheco to the conspiracy, and it does not appear that ambiguities in Whipple's testimony resulted from "artful phrasing."  See id.

Accordingly, the evidence is more than sufficient to prove that Cordero and Pacheco voluntarily and knowingly conspired with one another and with others to violate the narcotics laws. Plainly, they knowingly intended to distribute marihuana.  They constructively possessed the marihuana because of the actual possession of it by their co-conspirators.


III.

Pichardo contends that the district court committed reversible error by admitting, over his objection, Whipple's hearsay testimony that Pichardo was the source of the marihuana.  See United States v. Hernandez, 750 F.2d 1256 (5th Cir. 1985) (reversing conviction where government introduced evidence that another government agency had identified the defendant as a drug smuggler)).  Pichardo's record citation to page 298 of the trial transcript is inaccurate. See United States v. Valdez, 861 F.2d 427, 432 (5th Cir. 1988), cert. denied, 489 U.S. 1083 (1989) ("Without identifying any statement by a particular declarant, Valdez makes a blanket hearsay objection to four other witnesses' testimony.  These references to erroneous district court rulings are too vague to permit us to address them.").  The government surmises that Pichardo is complaining about Whipple's statements regarding the additional 280-pound quantity that was to be delivered after Whipple inspected

9

and accepted the 300-pound quantity.

There was no contemporaneous objection to this testimony.[2]  In the absence of an objection, the standard of review is "plain error," i.e., "error which is obvious, substantial, and so basic and prejudicial that the resulting trial lacks the fundamental elements of justice."  United States v. Casel, 995 F.2d 1299, 1308 (5th Cir.) (internal quotations omitted), cert. denied, 114 S. Ct. 472 (1993).

Relying upon United States v. Nazemian, 948 F.2d 522, 525-27 (9th Cir. 1991), cert. denied, 113 S. Ct. 107 (1992), and United States v. Lopez, 937 F.2d 716, 724 (2d Cir. 1991), the government argues that an interpreter's statement should be regarded as a defendant's own statement.  Although the question is res nova in this circuit, in United States v. Batencort, 592 F.2d 916, 917 (5th Cir. 1979), we held that customs agents' testimony regarding the defendant's statements made through a translator was harmless where the "translator," another customs agent, also testified and where the translator's fluency was not at issue).

We find the reasoning of the Second and Ninth Circuits persuasive, and we adopt it.  "Except in unusual circumstances, an interpreter is `no more than a language conduit and therefore his translation [does] not create an additional level of hearsay.'" Lopez, 937 F.2d at 724 (quoting United States v. Koskerides,

---

[2] The portion of the transcript cited by Pichardo contains an objection not to hearsay but to the Assistant United States Attorney's statement, in closing argument, that Whipple's Spanish comprehension was better than his verbal skill.

877 F.2d 1129, 1135 (2d Cir. 1989)) (brackets in original). In Nazemian, where, as here, the review was for plain error in the absence of an objection, the court concluded that (as here) the defendant "has offered nothing to suggest that the interpreter should not have been treated as a language conduit." 948 F.2d at 527. There is no plain error.


                                IV.

Cordero's attorney has moved for leave to withdraw as counsel pursuant to Anders v. California, 386 U.S. 738 (1967). Anders established standards for an appointed attorney who seeks to withdraw from a direct criminal appeal on the ground that the appeal lacks an arguable issue. After a "conscientious examination" of the case, the attorney must request permission to withdraw and must submit a "brief referring to anything in the record that might arguably support the appeal." Id. at 744. The attorney must isolate "possibly important issues" and must "furnish the court with references to the record and legal authorities to aid it in its appellate function." United States v. Johnson, 527 F.2d 1328, 1329 (5th Cir. 1976). After the defendant has had an opportunity to raise any additional points, the court fully examines the record and decides whether the case is frivolous. Anders, 386 U.S. at 744.

Cordero's lawyer has satisfied Anders sufficiently to trigger our obligation to examine the record. The attorney has briefed the question of whether Cordero's convictions were based upon suffi-

11

cient evidence; Cordero has not filed a response.

The district court sustained two of Cordero's objections to the presentence report ("PSR"). It reduced Cordero's offense level to 26 because the quantity of marihuana attributed to Cordero by the probation officer was too large. The district court also determined that Cordero should not be assessed a two-level upward adjustment for his rule as a leader of the conspiracy.

Cordero also argued that his offense level should be reduced because of his minor role in the conspiracy. Although the record does not contain a copy of the sentencing transcript, the district court apparently overruled this objection. As is discussed more fully above, Cordero negotiated for the delivery of several hundred pounds of marihuana and stood to profit substantially. "Review of sentences imposed under the guidelines is limited to a determination whether the sentence was imposed in violation of law, as a result of an incorrect application of the sentencing guidelines, or was outside of the applicable guideline range and was unreasonable." United States v. Matovsky, 935 F.2d 719, 721 (5th Cir. 1991) (citing 18 U.S.C. § 3742(e)). Findings of fact are reviewed for clear error. Id. The district court did not err by refusing to characterize Cordero's role as minor or minimal.

Cordero was sentenced at the bottom of the guideline range to concurrent terms of imprisonment of seventy months, concurrent terms of supervised release of five years, and a special assessment of $100. There is no appealable issue with respect to sentencing. A review of the record has not uncovered any other issues worthy of

12

discussion.

V.

In summary, Pacheco's and Pichardo's convictions are AFFIRMED. The motion by Cordero's attorney to withdraw is GRANTED, and Cordero's appeal is DISMISSED.