## STATE OF CONNECTICUT *v.* ANGEL MORALES
## (AC 21300)

Schaller, Flynn and McDonald, Js.

Argued February 14—officially released July 15, 2003

*Martin Zeldis*, senior assistant public defender, and *Angela L. Ruggiero*, special public defender, with whom, on the brief, was *Joseph A. Niglio*, certified legal intern, for the appellant (defendant).

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Laura M. Rose*, former assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, Angel Morales, was convicted, following a trial to the court, of risk of injury to a child in violation of General Statutes (Rev. to 1997) § 53-21 (2).[1] The defendant claims that the trial court's decision was improper because (1) the finding of guilty of risk of injury to a child was factually inconsistent with the court's finding of not guilty of sexual assault in the first degree, (2) the court used constancy of accusation testimony for substantive purposes and (3) the defendant was deprived of his constitutional rights when the court considered his statements to the police, which had been translated for the defendant by a police detective who did not testify. We affirm the judgment of the trial court.

The record discloses the following evidence before the trial court. The victim, R, was a foster child living in the defendant's apartment.[2] At the time of the charged

---

[1] The court also found the defendant not guilty of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2).

[2] In accordance with General Statutes § 54-86e, we will refer to the victim as "R." The defendant's wife and a second foster child also lived in the same apartment.

incident, R was eight years old. The defendant was illiterate and spoke only Spanish. R could speak some Spanish but, apparently, had difficulty communicating with the defendant at times. R was unhappy living with the defendant and his wife for several reasons. She was separated from her sister. The defendant and his wife were strict and reluctant to let R play outside. R did not like the food that they served to her. On Saturday, October 17, 1998, the defendant and R were together in the defendant's living room watching television.

The court specifically found that "the state has proven beyond a reasonable doubt that the defendant, while lying on his back on a couch, had R, a child under sixteen years of age, lay on top of him. While R laid chest to chest upon him, the defendant placed his hand inside the front of R's underwear and sexually assaulted her. The defendant then asked the child how it felt, and she told him that it was uncomfortable. At this point, the child got off the defendant and sat in a different chair in the room. Shortly after R sat down, the defendant got off of the couch, approached R, and pulled her pants and underwear at least partially down. The defendant then looked closely at R's genital area telling her that he wanted, 'to see if it was red.' The defendant then told R that, 'it was okay' allowed R to pull her pants back up."

The court also had before it evidence of the following facts: R approached one of her teachers on Tuesday, October 20, and told her that the defendant had put his hand down her pants. The teacher and the school's vice principal then had R remain after school, and they contacted the department of children and families. A few days later, Kathleen Barrett of the Children's Advocacy Center at Saint Francis Hospital and Medical Center in Hartford interviewed R about what she had told her teacher. At that time, R repeated the allegations that she had made to her teacher, although she added

the detail that the defendant had penetrated her vagina with his finger.

Detective Mack Hawkins of the Hartford police department, having viewed Barrett's interview of the victim, R, went to the defendant's apartment on at least three occasions. Detective Ralph Gonzalez, a Spanish-speaking police officer, went with Hawkins to act as an interpreter between Hawkins and the defendant. The defendant gave two statements to the police. The first statement was made verbally on November 6, 1998. Hawkins typed the statement at his office and returned to the defendant's apartment on November 10. On November 10, these same detectives again met with the defendant. Gonzalez read the defendant's statement to him in Spanish, had him make any necessary changes to it and asked him to sign it. In that first statement, the defendant essentially denied that he had any physical contact with R at all. Also on November 10, however, after the defendant had signed that first statement, he told the police that he had forgotten to tell them something. He gave them some additional information, which was then reduced to a separate typewritten statement, which the defendant signed on November 12. In that second statement, the defendant said that he was lying down on the couch sleeping, and when he woke up and stretched out his hands, by mistake he touched R "in her toto (vagina)."

The defendant was arrested and charged with sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), and risk of injury to a child in violation of § 53-21 (2). The defendant requested a trial by the court, not a jury. At that trial, R testified that the defendant was lying on the couch, watching television with her when he asked her to give him a hug. She stated that when she went to give him a hug, he picked her up and put her on top of him. R testified that when she was on top of him, the defendant "took his hand

and put it in [her] vagina." R further testified and demonstrated that, after inserting his finger in her vagina, the defendant moved his finger in circles. R's teacher and Barrett were called as constancy of accusation witnesses. The teacher testified that, although R told her that the defendant had touched her genitalia, R did not tell her that he had actually inserted his finger in her vagina.

The court made the following specific findings, which related to its judgment of not guilty on the sexual assault count: "R did volunteer to [her teacher] that the defendant had touched her private part, specifically, with his thumb. R did not report any act of the defendant involving his use of his index finger. Unlike the other inconsistencies in R's account, which the defendant noted during trial, this inconsistency implicates directly the sufficiency of the state's proof on a critical element of one of the crimes, the element of penetration as required under the charge of sexual assault in the first degree. This inconsistency surfaced in the very first statement that R gave to anyone concerning this incident. And in such circumstances this discrepancy necessarily takes on greater significance. The state has not provided the court with any explanation as to how or why the child's account has varied in this regard, nor did R explain during her testimony why the account she provided [her teacher] differed in this important respect. Nor, for that matter, has the state suggested, nor should it have, that [the teacher's] recollection of what R told her was not accurate. [The teacher] testified, on cross-examination, that she had immediately reduced to writing the information she received from R knowing that this written account would be forwarded to the department of children and families. These factors, and I refer here to the child's reference to the defendant's use of his thumb and the initial absence of any claim by the child of any penetration,

coupled with other evidence in the case, has left, in the court's mind, a reasonable doubt as to whether the defendant, in assaulting the child, penetrated her vagina."

Hawkins testified for the state as to his interviews of the defendant and the statements signed by the defendant. Gonzalez, the detective who had accompanied Hawkins to those interviews and had translated between the defendant and Hawkins, was not called as a witness by either side.

I

The defendant's first claim relates to the fact that the court found him not guilty of sexual assault in the first degree but guilty of risk of injury to a child. The defendant argues that his alleged misconduct consisted of one continuous act, and so it was factually inconsistent for the court to find that there was a reasonable doubt that there had been penetration for the purpose of proving sexual intercourse under § 53a-70 (a) (2) and yet that there was proof of guilt beyond a reasonable doubt that he had contact with the intimate parts of the child sufficient to violate the risk of injury statute.

A

We begin by noting that the defendant states that he "concedes that the verdicts here are not legally inconsistent." Inexplicably, though, the defendant calls our attention to, and specifically quotes from, several cases involving the very issue of legally inconsistent verdicts. For example, the defendant quotes our Supreme Court's decision in *State* v. *DeCaro*, 252 Conn. 229, 244, 745 A.2d 800 (2000), where the court stated: "The issue of legal inconsistency typically arises when a defendant is convicted of two offenses that contain contradictory elements. Such verdicts are legally inconsistent if the existence of the essential elements for one offense

negates the existence of the essential elements for another offense of which the defendant also stands convicted." (Internal quotation marks omitted.) Id. To the extent that the defendant presents a claim that the court's verdicts were legally inconsistent, we disagree with the defendant.

"If the offenses charged contain different elements, then a conviction of one offense is not inconsistent on its face with an acquittal of the other." (Internal quotation marks omitted.) Id. The court found the defendant guilty of risk of injury to a child, in violation of § 53-21 (2), but not guilty of sexual assault in the first degree in violation of § 53a-70 (a) (2).[3] To find the defendant guilty of sexual assault in the first degree, the court would have had to find that he had engaged in sexual intercourse with R. Section 53a-65 defines "sexual intercourse" and requires penetration for the act to be completed. In finding the defendant guilty of risk of injury to a child, though, the court had to determine that the defendant had mere contact with the intimate parts of R. The two offenses charged contain different elements—the act of penetration in § 53a-70 as opposed to mere contact in § 53-21. See *State* v. *Weiner*, 61 Conn. App. 738, 744–45, 767 A.2d 1220, cert. denied, 256 Conn. 902, 772 A.2d 600 (2001). Because the necessary elements of the two statutes are distinct, we conclude that the court's respective findings of not

---

[3] General Statutes (Rev. to 1997) § 53-21 provides in relevant part: "Any person who . . . (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of a class C felony."

General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

guilty and guilty of these distinct crimes were not legally inconsistent.

### B

The defendant's claim that the court's findings as to guilt were factually inconsistent was not raised at trial.[4] The defendant, therefore, requests that we review this claim pursuant to the analysis set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). To obtain relief under *Golding* review, however, the defendant's claim must be of constitutional magnitude. See id. "The claim that inconsistent verdicts must be set aside is not one of constitutional dimension." *State* v. *Gaston*, 198 Conn. 490, 492, 503 A.2d 1157 (1986), citing *United States* v. *Powell*, 469 U.S. 57, 65, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984); see also *State* v. *Milner*, 46 Conn. App. 118, 125, 699 A.2d 1022 (1997). The claim not being one of constitutional magnitude, the defendant cannot obtain a new trial under *Golding*.

Our rule that appellate courts will not review claims of factual inconsistency, however, has been analyzed generally in the context of trials by jury. See, e.g., *State* v. *Higgins*, 74 Conn. App. 473, 485–87, 811 A.2d 765, cert. denied, 262 Conn. 950, 817 A.2d 110 (2003); *State* v. *Spyke*, 68 Conn. App. 97, 118, 792 A.2d 93, cert. denied, 261 Conn. 909, 804 A.2d 214 (2002); *State* v. *Weiner*, supra, 61 Conn. App. 745–47. "The law permits inconsistent verdicts because of the recognition that jury deliberations necessarily involve negotiation and compromise. . . . [I]nconsistency of the verdicts is immaterial. . . . As Justice Holmes long ago observed in the case of *Dunn* v. *United States*, 284 U.S. 390,

---

[4] The defendant argues in his initial brief that the claim of factual inconsistency was preserved by his motion for a judgment of acquittal and his various posttrial motions. On the contrary, the defendant's argument in those motions was that the evidence before the court did not "reasonably or fairly permit a finding of the defendant's guilt of [risk of injury to a child] beyond a reasonable doubt."

393–94, 52 S. Ct. 189, 76 L. Ed. 356 (1932): The most that can be said in such cases [i.e., of inconsistent verdicts] is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity. . . . That the verdict may have been the result of compromise, or a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." (Internal quotation marks omitted.) *State* v. *DeCaro*, supra, 252 Conn. 242–43.

The defendant's case, in contrast, was a trial to the court. The defendant argues that the justifications for precluding claims of factual inconsistency in jury verdicts do not apply to court trials. Although our Supreme Court has not passed on this precise issue, a similar situation was presented to us in *State* v. *Pieger*, 42 Conn. App. 460, 465–66, 680 A.2d 1001 (1996), aff'd, 240 Conn. 639, 692 A.2d 1273 (1997). In *Pieger*, we stated: "The United States Supreme Court has held that the issue [of factually inconsistent verdicts] is not of constitutional dimension even if the verdict is rendered by a court rather than a jury. *Harris* v. *Rivera*, 454 U.S. 339, 347–48, 102 S. Ct. 460, 70 L. Ed. 2d 530 (1981)." *State* v. *Pieger*, supra, 466. The defendant's claim of factual inconsistency, therefore, fails to satisfy the second prong of *Golding* regardless of whether the verdict was rendered by a court or a jury.

Even if a claim of factual inconsistency were of constitutional magnitude in the case of a court trial, however, no such factual inconsistency exists in this case. The defendant's claim would fail to satisfy the third prong of *Golding* even if it satisfied the second. The court in its decision stated: "Simply stated, I find R to

have been a credible and truthful witness in substantial part. The court further finds that R's account of the events of October 17, 1998, has been consistent in its core elements . . . and that the conduct of the defendant as credibly and reliably recounted by R proves beyond a reasonable doubt that the defendant engaged in some criminal conduct.

\* \* \*

"The defendant's claim to the contrary, not withstanding, this was not a case involving simply the words of a child. This case involved, as well, the words of an accused. And, frankly, the words of this accused are preposterous. The court heard evidence from Detective Hawkins concerning the two written statements the defendant gave in the weeks after the investigation began. After the defendant gave a completely exculpatory first statement and Detective Hawkins returned to the defendant's home so that he could review that statement and to sign it, the defendant made an additional admission. At this point, and this became the subject of the second statement, the defendant volunteered to police that he had forgotten to say something during the first interview. The defendant told police that he now recalled that he had once accidentally touched R in her 'toe-toe,' a Spanish word, which the evidence shows, either refers to the female private parts, generally or specifically to the vagina. The defendant went on to explain that this touching had occurred when he had awakened from sleep on the couch and had stretched his arms out, presumably as one may do when one first wakes up . . . .

"The defendant's story is patently absurd. As I see it, the defendant was compelled to weave his tale involving an accidental touching because he knew that R had reported his sexual abuse of her to the police. And knowing that the police were taking this matter seri-

ously, the defendant was determined to concoct a set of facts which would bear a passing resemblance to the conduct R had reported, but which would, at the same time, give his conduct a wholly innocent explanation . . . ."

The court's explanation demonstrates that it found R's testimony to be credible, but the lack of a completely consistent account having been reported to R's teacher raised a reasonable doubt that penetration had occurred. The court therefore found the defendant not guilty of first degree sexual assault.

The defendant argues that the incident alleged was one act that could not be severed into two parts: touching of R's intimate parts and penetration of her vagina. We disagree. It was not impossible that the defendant could have merely touched R's intimate parts but not have penetrated her vagina. "It is for the trier of fact, in this case, the trial court, to decide whether to believe all or a part of a witness' testimony and to determine the credibility of the witness." *State* v. *Gainer*, 51 Conn. App. 563, 572, 724 A.2d 521 (1999); see also *State* v. *Person*, 236 Conn. 342, 347, 673 A.2d 463 (1996). The court was entitled to believe R insofar as she testified that the defendant had placed his hand in her underwear and touched her private parts, and yet find that the evidence had not shown beyond a reasonable doubt that upon placing his hand in R's underwear, the defendant inserted his finger into her vagina. The court's judgment, therefore, was not factually inconsistent.

C

Because the state argued that claims of factual impossibility are not reviewable on appeal, the defendant, in his reply brief, attempts to reformulate his first claim into one of sufficiency of evidence. The defendant argues that "[a]t its base and in the instant context, this is a sufficiency of the evidence claim which, for the

reasons argued in the defendant's main brief, has been preserved." "Unpreserved sufficiency claims are reviewable on appeal because such claims implicate a defendant's federal constitutional right not to be convicted of a crime upon insufficient proof." (Internal quotation marks omitted.) *State* v. *Morgan*, 70 Conn. App. 255, 281, 797 A.2d 616, cert. denied, 261 Conn. 919, 806 A.2d 1056 (2002).

At no point in the defendant's initial brief, however, did he characterize his first claim as a challenge to the sufficiency of the evidence supporting his conviction for risk of injury to a child. Furthermore, he fails to make any mention of our standard of review for such claims in either his initial or reply brief.[5] "[I]t is a well established principle that arguments cannot be raised for the first time in a reply brief." (Internal quotation marks omitted.) *State* v. *Edward B.*, 72 Conn. App. 282, 302 n.12, 806 A.2d 64, cert. denied, 262 Conn. 910, 810 A.2d 276 (2002). We therefore decline to review the defendant's claim that the conviction for risk of injury to a child was not supported by sufficient evidence.

## II

The defendant next claims that the court used the testimony of R's teacher, a constancy of accusation

---

[5] "In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"The question on appeal is not whether we believe that the evidence established guilt beyond a reasonable doubt, but rather whether, after viewing the evidence in the light most favorable to sustaining the judgment, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . While the jury may not speculate to reach a conclusion of guilt, [it] may draw reasonable, logical inferences from the facts proven to reach a verdict. . . . Deference is given to the trier of fact who had the opportunity to observe the conduct, demeanor and attitude of the trial witnesses and to assess their credibility." (Internal quotation marks

witness, for substantive purposes in finding him guilty of risk of injury to a child. The defendant argues that the court's reliance on the teacher's testimony violated our Supreme Court's holding in *State* v. *Troupe*, 237 Conn. 284, 304–305, 677 A.2d 917 (1996). This argument is wholly without merit.

The court did consider the teacher's testimony in finding the defendant not guilty of sexual assault. The court, in fact, treated R's report to her teacher as a prior *inconsistent* statement because R's testimony was different in certain details from what she had told her teacher, such as whether the defendant had used his index finger or thumb, and her testimony contained an accusation of penetration, which had not been included in her initial report to her teacher. Contrary to the defendant's assertion, though, there is absolutely no indication in the record that the court used the teacher's testimony for substantive purposes in reaching its decision.

### III

The defendant's third claim involves his written statements to Detective Hawkins who, with the assistance of Detective Gonzalez, interviewed the defendant. It is undisputed that the defendant was illiterate in both English and Spanish and could speak only Spanish. The defendant's daughter-in-law, Nilsa Morales, who was able to speak and read both English and Spanish, made herself present during the interviews. Nilsa Morales assisted Gonzalez in speaking to the defendant by listening to and monitoring the conversation. Her role was to make sure of the language translation because she understood it. Nilsa Morales witnessed the defendant's written statements. The second statement indicates that was translated by both Gonzalez and Nilsa Morales.

omitted.) *State* v. *Jimenez*, 73 Conn. App. 664, 666, 808 A.2d 1190, cert. denied, 262 Conn. 929, 814 A.2d 381 (2002).

Hawkins, who does not speak Spanish, testified as to the defendant's statements as they had been translated to him by Gonzalez. Neither Gonzalez nor Nilsa Morales testified at trial.

The defendant claims that he was deprived of his constitutional rights to due process, confrontation, equal protection and a fair trial when the court considered his statements absent the testimony of the interpreter, Gonzalez.[6] The defendant did not object to the admissibility of his two written statements at trial, but he requests that we review this claim pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. This claim raises issues regarding the relationship between our evidentiary rules concerning hearsay and authentication of documents and the confrontation clause.

A

We begin our analysis by considering whether the defendant has actually raised a claim of constitutional magnitude or whether he is robing a garden variety evidentiary claim in the majestic garb of constitutional claims. See *State* v. *William C.*, 71 Conn. App. 47, 71 n.12, 801 A.2d 823, cert. granted on other grounds, 262 Conn. 907, 810 A.2d 277 (2002).

Our code of evidence defines "hearsay" as "a statement, other than one made by the declarant while testifying at the proceeding, offered in evidence to establish the truth of the matter asserted." Conn. Code Evid. § 8-1 (3). The United States Supreme Court held in *California* v. *Green*, 399 U.S. 149, 90 S. Ct. 1930, 26 L. Ed. 2d 489

---

[6] The defendant has failed to specify whether he is relying on the federal or state constitution and has not complied with Practice Book § 67-4, which requires an appellant's brief or appendix to contain "[t]he text of the pertinent portions of any constitutional provision . . . at issue or upon which the appellant relies . . . ." Practice Book § 67-4 (e). The defendant has failed to provide an independent state constitutional analysis, and we, therefore, analyze this claim pursuant to the federal constitution alone. See *State* v. *Johnson*, 227 Conn. 611, 614–15, 630 A.2d 69 (1993).

(1970), that "the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." Id., 158.[7] The obverse of this holding is that "when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980).

With this in mind, we are faced with the question of just who was the declarant. The defendant argues that Gonzalez was the declarant. This argument is indeed compelling in that Hawkins was not transcribing the defendant's own words, but was attempting to reduce to writing what Gonzalez told him had been said by the defendant. Rather than one out-of-court statement, we are faced with three layers of out-of-court statements: the defendant's verbal statement made in Spanish, Gonzalez' description to Hawkins of what was said by the defendant, and Hawkins' typewritten account of what Gonzalez told him was said by the defendant. We at least can deal somewhat summarily with two of these layers, because the defendant's own statements do fall within a firmly rooted hearsay exception as a statement of a party opponent; see Conn. Code Evid. § 8-3 (1); and Hawkins testified as a witness and was subject to cross-examination, thus satisfying any confrontation clause problem. See *California* v. *Green*, supra, 399

[7] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

U.S. 158. The difficulty, as the defendant correctly points out, is the fact that Gonzalez' translation comes between what was said by the defendant and what was transcribed by Hawkins.[8]

The defendant's third claim thus appears to be centered on the question of whether the written statements should be considered Gonzalez' or whether, under the circumstances, Gonzalez should be considered a "language conduit" and the statements considered to be those of the defendant. The answer to this question will determine whether the defendant has satisfied the second prong of *State* v. *Golding*, supra, 213 Conn. 239–40, by making a claim of constitutional magnitude or whether he has made merely an evidentiary claim.

### B

The parties argue, and we agree, that we should apply the "language conduit theory." See *United States* v. *Martinez-Gaytan*, 213 F.3d 890, 892 (5th Cir. 2000); *United States* v. *Nazemian*, 948 F.2d 522, 527 (9th Cir. 1991), cert. denied, 506 U.S. 835, 113 S. Ct. 107, 121 L. Ed. 2d 65 (1992); *United States* v. *Lopez*, 937 F.2d 716, 724 (2d Cir. 1991). Using the rule applied by several of the federal circuit courts of appeal in similar situations, we can determine on a case-by-case basis whether an interpreter can be considered to be merely a language conduit for a non-English speaking declarant. If the interpreter is a mere language conduit, then the inter-

---

[8] We are not faced with an argument that, because the defendant signed it, the typewritten statement itself falls within the exception for "a statement that the party has adopted or approved . . . ." Conn. Code Evid. § 8-3 (1) (B). Even were we faced with such an argument, we would need some assurance that the defendant understood the typed statement. See *State* v. *Reddick*, 36 Conn. App. 774, 785, 654 A.2d 761, cert. denied, 232 Conn. 922, 656 A.2d 671 (1995). Given the fact that the defendant was illiterate and could not speak English, the language in which the statement was written, we cannot resolve the defendant's third claim without addressing Gonzalez' involvement.

preter and the declarant are treated as identical for testimonial purposes, and the admission of the declarant's statements, even in the absence of the interpreter's testimony, will not create confrontation clause problems. *United States* v. *Nazemian,* supra, 528.[9]

"The circuits which have considered the question have recognized a number of factors which may be relevant in determining whether the interpreter's statements should be attributed to the defendant under either the agency or conduit theory, such as which party supplied the interpreter, whether the interpreter had any motive to mislead or distort, the interpreter's qualifications and language skill, and whether actions taken subsequent to the conversation were consistent with the statements as translated." Id., 527. Applying these four factors in light of the federal cases that have done so in similar situations, we conclude that Gonzalez was merely a language conduit for the defendant, and there was, therefore, no confrontation clause problem raised by the introduction of the defendant's written statements.

There is no dispute that the police supplied the interpreter, Gonzalez. That one factor would weigh against treating him as a language conduit. The test is clearly a *balancing* test, however, and this one factor need not

---

[9] The *Nazemian* court held that the defendant and the interpreter were treated as identical and, therefore, the admission of testimony as to the defendant's translated statements "created neither confrontation clause nor hearsay problems." *United States* v. *Nazemian,* supra, 948 F.2d 528. We do not decide in the present case whether the language conduit rule could be used in Connecticut to overcome an evidentiary objection such as one based on hearsay or lack of authentication, because no such objection was made in this case. We analyze such unpreserved claims under the *Golding* standard rather than the abuse of discretion standard for evidentiary claims. See *State* v. *Dehaney,* 261 Conn. 336, 354–55, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003). Furthermore, unpreserved evidentiary claims are not entitled to *Golding* review. See *State* v. *Hawkins,* 51 Conn. App. 248, 253 n.5, 722 A.2d 278 (1998).

be dispositive of the result. See, e.g., id., 527; *United States* v. *Koskerides*, 877 F.2d 1129, 1135 (2d Cir. 1989); *United States* v. *Beltran*, 761 F.2d 1, 8–9 (1st Cir. 1985); *United States* v. *Alvarez*, 755 F.2d 830, 859 (11th Cir.), cert. denied sub nom. *Hernandez* v. *United States*, 474 U.S. 905, 106 S. Ct. 274, 88 L. Ed. 2d 235 (1985); *United States* v. *Da Silva*, 725 F.2d 828, 832 (2d Cir. 1983).

The defendant does not argue that Gonzalez had any motive to mislead or to distort the defendant's statements. We observe that the record also does not demonstrate that Gonzalez had any such motive. Furthermore, we do not presume that an officer involved in an investigation has a personal interest or bias against a defendant. See *State* v. *Otto*, 50 Conn. App. 1, 9, 717 A.2d 775 (investigating officers who had settled tort claims on basis of defendant's vehicular assault of them had no personal interest in outcome of related criminal trial), cert. denied, 247 Conn. 927, 719 A.2d 1171 (1998); see also *United States* v. *Martinez-Gaytan*, supra, 213 F.3d 892 ("we presume no motive to mislead or distort"). A determination of personal interest or bias would need to be supported by some evidence presented to the court so that it might itself make a determination as to the credibility of the witnesses presenting such evidence. A similar problem arises in cases where a defendant challenges a finding that his confession was knowing, voluntary or intelligent. The question of whether a defendant was advised of his *Miranda* rights raises questions of credibility, and, even where the defendant has difficulty understanding English or is illiterate, the state is not forced to overcome a presumption that the police may have taken advantage of the defendant's position. See generally *State* v. *Madera*, 210 Conn. 22, 36–39, 554 A.2d 263 (1989).

The circumstances surrounding the defendant's two written statements support the conclusion that Gonzalez' qualifications and language skill were sufficient to

satisfy the third factor of the language conduit analysis. Gonzalez acted as an English-Spanish interpreter on at least three occasions at the defendant's home. "Although the government presented no formalized evidence of the interpreter's competence, such as language degrees or certifications, the fact that the interpreter continued in that role over a prolonged period and multiple meetings suggests that the translation must have been competent enough to allow communication between the parties." *United States* v. *Nazemian*, supra, 948 F.2d 528.

There is no evidence that the defendant had any difficulty understanding Gonzalez or that Gonzalez' efforts as an interpreter created any confusion for the defendant. The United States Court of Appeals for the Second Circuit in *United States* v. *Da Silva*, supra, 725 F.2d 831, considered a similar situation in which a defendant challenged the accuracy of a translation. The *Da Silva* court noted that "[the defendant] would likely have expressed confusion or distress if [the interpreter's] Spanish had deviated materially from the patterns with which [the defendant] was familiar. There is no indication whatever that he did so." Id.

The fourth factor of the language conduit analysis is "whether actions taken subsequent to the conversation were consistent with the statements as translated." *United States* v. *Martinez-Gaytan*, supra, 213 F.3d 892. The defendant, after giving his verbal statements to the police, signed the typewritten statements at issue here. Compare id., 891. The testimony and those statements themselves demonstrate that their contents were explained to the defendant and that he had an opportunity to correct any portions of them which he felt contained an error in either the translation or transcription. Both statements show the defendant's daughter-in-law, Nilsa Morales, signing as a witness. The first statement contains two changes made with the assistance of Nilsa

Morales before it was signed. That first statement was the one the court described as "completely exculpatory." Indeed, the changes in that statement support an inference that the defendant had the ability and opportunity to make any changes to the written statements if the statements did not accurately reflect his verbal account of the events. The second statement, however, contains no changes, and the defendant signed that statement with Nilsa Morales acting as a witness. It is this second statement that contains the word "toto," which the defendant now argues was inaccurately translated. The text of the second written statement also indicates that both Gonzales and Nilsa Morales translated it. Although, as Hawkins testified, Gonzales acted as Hawkins' principal interpreter in preparing the written statement, as Hawkins also testified, Nilsa Morales monitored the translation and made sure that it was correct.

During the cross-examination of Hawkins, the defendant attempted to suggest that there might have been some discussion amongst Gonzalez, Nilsa Morales and the defendant about the English meaning of the word "toto."[10] However, the defendant presented no evidence at trial, either through Nilsa Morales or Gonzalez, that either written translation was inaccurate.

---

[10] During the defendant's cross-examination of Hawkins, the following exchange took place:

"[Defense Counsel]: Okay. And do you recall there being a discussion, whether it was in English or in Spanish amongst the woman, Nilsa Morales; Detective Gonzalez; and quite possibly, the defendant, about the word 'toto' and the words 'private parts' versus 'vagina'?

"[Hawkins]: I don't recall. If I can look at my notes.

"Q: Please. Go right ahead.

"A: Just to see if anything—anything was written down about that.

(The witness reviews his notes.)

"A: No.

"Q: No?

"A: No, I don't recall. I don't have anything written down."

There are several additional factors that do not appear to fit neatly into any one of the four factors listed by the *Nazemian* court but which, nevertheless, have arisen in federal cases similar to this one. The presence of a third party during the conversation was used to support a conclusion that the interpreter was a language conduit in *United States* v. *Koskerides*, supra, 877 F.2d 1135. The third party in this case, Nilsa Morales, conversant in both English and Spanish, listened to and monitored the translated conversations and signed the written statements as a witness. Furthermore, she was a member of the defendant's family.

In addition, the federal courts have treated the lack of a contemporaneous objection as a factor that militates in favor of treating the interpreter as a mere language conduit. We need only compare the outcome of cases such as *United States* v. *Cordero*, 18 F.3d 1248, 1252 (5th Cir. 1994), where there was no contemporaneous objection, with *United States* v. *Martinez-Gaytan*, supra, 213 F.3d 891, where the defendant raised the issue of the reliability of the translation in a motion to suppress. In *Cordero*, the court held that the language conduit rule applied, whereas in *Martinez-Gaytan* the court decided that it needed the testimony of the interpreter before the defendant's statement could be admitted. We, likewise, view the defendant's claim that the absence of Gonzalez from the trial rendered his written statements inadmissible with some skepticism when the defendant had the opportunity to raise this issue before the trial court. The defendant could have objected that there had been an inadequate showing that what was contained in the written statements accurately reflected his verbal accounts. If the defendant had done so, the state had several options available to it, which would have dealt with any such lingering doubts as to the documents' authenticity.

Finally, the testifying witness' proficiency in the language translated can be a factor in the outcome of a claim such as this. It is undisputed that Hawkins is not fluent in Spanish. Hawkins did testify, however, that he was familiar from previous cases with the incriminating word, "toto," contained in the defendant's second written statement. The testifying witness' familiarity with the defendant's native language is certainly one of the factors that the federal courts have considered. See *United States* v. *Martinez-Gaytan*, supra, 213 F.3d 892 (witness did not understand Spanish); *United States* v. *Cordero*, supra, 18 F.3d 1251 (witness not fluent but recognized Spanish pronunciation of word marijuana); *United States* v. *Garcia*, 16 F.3d 341, 343 (9th Cir.) (witness not fluent but able to confirm substance of translation), cert. denied, 513 U.S. 860, 115 S. Ct. 171, 130 L. Ed. 2d 107 (1994). The situation here is most closely analogous to *Cordero* in that Hawkins is familiar with the word "toto" and testified that the word "came from the defendant."

With the exception of the fact that the state supplied the interpreter, every factor which we have considered leads us to conclude that Gonzalez was a mere language conduit for the defendant. As such, we treat the defendant, and not Gonzalez, as the declarant when it comes to his verbal and written statements.

The defendant cites our Supreme Court's decision in *State* v. *Rosa*, 170 Conn. 417, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976), for support of his claim. In *Rosa*, a defendant who did not understand much English gave a statement to a Spanish-speaking police officer, who then translated the defendant's words into English for a second police officer who was acting as a stenographer. Id., 421–22. That second officer spoke only English. Id., 426. After the statement had been typed in English, it was read back in Spanish to the defendant who, after making some

corrections to it, signed all the pages of the statement. Id., 421–22. At trial, the defendant moved to suppress the written statement, and the court granted his motion, "not based upon the credibility or truthfulness of the accused and the police officers, but based on the procedure employed in the taking of the statement." (Internal quotation marks omitted.) Id., 422. Our Supreme Court, in affirming the defendant's conviction, held that the written statement was not made involuntarily and did not taint the defendant's subsequent oral statements. Id., 426–27. The court observed that the written statement was properly excluded because it was not authenticated. Id.

The present case presents a situation significantly different from that of *Rosa*. The *Rosa* defendant preserved the evidentiary issue by his motion to suppress. The defendant here did not. He did not object to the introduction of his written statements into evidence or to Hawkins' testimony pertaining thereto at trial. He did not move to suppress his statements. We are, thus, faced with unpreserved evidentiary claims. The *Rosa* court was not faced with the question of whether a defendant could obtain relief pursuant to *Golding* by an unpreserved evidentiary claim of hearsay or lack of authentication. See id.[11] Our rule is that unpreserved evidentiary claims will not be reviewed pursuant to *State* v. *Golding*, supra, 213 Conn. 241 ("once identified, unpreserved evidentiary claims masquerading as constitutional claims will be summarily dismissed").

Although on appeal the defendant attempts to raise the question of authentication, this issue was not raised at trial. "Authentication and identification are aspects of relevancy that are a condition precedent to admissi-

[11] Our decision here should not be considered a holding that the defendant's statements were properly authenticated. See generally *State* v. *Rosa*, supra, 170 Conn. 427 n.6.

bility. The requirement of authentication or identification is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." 29A Am. Jur. 2d Evidence § 945 (1994). The fact that a proponent may or may not have offered sufficient evidence to make its prima facie showing that a document is what the proponent claims raises an evidentiary question for the trial court to determine. If the opponent believes that the threshold showing of admissibility has not been met, the proper course of action is for the opponent to make an objection so that the document's proponent may offer such additional proof as is necessary and available at that time. Had such an objection been made in this case, the state could have requested a continuance to allow Gonzalez to testify or could have called Nilsa Morales who witnessed the defendant's statements. The defendant, having failed to object on the basis of a lack of authentication of his own statements, is not entitled to the relief he requests pursuant to *Golding*.

The defendant's claim regarding the admission of these statements does not raise any constitutional questions but, rather, is merely an evidentiary claim relating to authentication. See *State* v. *Nunes*, 58 Conn. App. 296, 305, 752 A.2d 93 ("[d]ecisions on whether a proper foundation has been laid are evidentiary and, therefore, not constitutional in nature"), cert. denied, 254 Conn. 944, 762 A.2d 906 (2000). His claim, therefore, fails to satisfy the second prong of *Golding*, and we conclude that he cannot obtain relief for this unpreserved claim. See *State* v. *Hawkins*, 51 Conn. App. 248, 253 n.5, 722 A.2d 278 (1998).

The judgment is affirmed.

In this opinion the other judges concurred.